**COMPETITIVE TECHNOLOGIES,
et al., Plaintiffs,**

v.

**FUJITSU LIMITED, et al., Defendants.**

**No. C–02–1673 JCS.**

United States District Court,
N.D. California.

Feb. 25, 2003.

See also 286 F.Supp.2d 1161, 2003 WL 22138467.

George C. Beck, Foley & Lardner, Washington, DC, Jack Russo, Tim C. Hale, Russo & Hale, LLP, Palo Alto, CA, John C. Cotter, Testa, Hurwitz and Thibeault, LLP, Joseph M. Talarico, Richard J. Phelan, Paul E. Schaafsma, Foley & Lardner, Chicago, IL, Karen L. Febeo, Stephanie M. Zierten, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Nancy J. Geenan, Foley & Lardner, Attorneys at Law, San Francisco, CA, for Competitive Technologies, Inc.

Derek A. Roach, Mark L. Gordon, Gordon & Glickson, LLC, Chicago, IL, George C. Beck, Foley & Lardner, Washington, DC, Joseph M. Talarico, Paul E. Schaafsma, Richard J. Phelan, Foley & Lardner, Chicago, IL, Mark L. Niu, Irell & Manella, Long Beach, CA, Morgan Chu, Roman Melnik, Irell & Manella, LLP, Los Angeles, CA, Nancy J. Geenan, Foley & Lardner, Attorneys at Law, San Francisco, CA, Reynaldo C. Barcelo, Irell & Manella, LLP, Newport Beach, CA, for Board of Trustees of University of Illinois.

G. Brian Bussey, Morrison & Foerster, LLP, Washington, DC, Jun Tsutsumi, Morrison & Foerster, LLP, New York City, Lorna K. Geiler, Meyer Capel, PC, Champaign, IL, for Fujitsu Ltd., Fujitsu America, Inc., and Fujitsu General America Corp.

G. Brian Bussey, Morrison & Foerster, LLP, Washington, DC, Jun Tsutsumi, Morrison & Foerster, LLP, New York City, Lorna K. Geiler, Meyer Capel, PC, Champaign, IL, Karl J. Kramer, Richard D. Mosier, Steven W. Ritcheson, Morrison & Foerster, LLP, Palo Alto, CA, for Fujitsu Microelectronics, Inc., Fujitsu General Ltd., and Fujitsu Hitachi Plasma Display, Ltd.

## CORRECTED ORDER GRANTING IN PART AND DENYING IN PART MOTIONS BY COMPETITIVE TECHNOLOGIES AND UI AND DENYING AS MOOT FUJITSU'S CONDITIONAL CROSS–MOTION*

SPERO, United States Magistrate Judge.

### I. *INTRODUCTION*

On Friday, December 20, 2002, at 9:30 a.m., the following motions came on for hearing:

- Competitive Technologies' Motion To Dismiss Under Federal Rules Of Civil Procedure 12(b)(6) and 12(b)(7) [1];
- The University of Illinois'
 - (1) Motion To Dismiss Counterclaims 5–13 Pursuant To Rule 12(b)(1) And/Or 12(b)(6);
 - (2) Special Motion To Strike Counterclaims 10–13 Pursuant To CCCP § 425.16; And
 - (3) Motion To Strike The Tenth Affirmative Defense Pursuant To Rule 12(f);

---

* Editor's notes: Portions of this order are omitted as this order was redacted by the Court.

1. The Court assumes that the reference to Rule 12(b)(7) in the title of this motion is a typographical error and that the motion is brought pursuant to Rule 12(b)(6) and 12(b)(1).

- Fujitsu Limited's and Fujitsu Hitachi Plasma Display Limited's Conditional Cross–Motion To Set A Schedule For A Probability Showing Pursuant To Cal.Code. Civ. Proc. § 425.16(b).[2]

For the reasons stated below, the UI Motion and the Competitive Motion are GRANTED in part and DENIED in part. The Fujitsu Conditional Cross–Motion is DENIED as moot.

## II. BACKGROUND

### A. Facts [3]

This case involves two patents related to an electronic circuit for plasma display panels ("PDPs")—U.S. Patent Nos. 4,866,-349 ("the '349 Patent") and 5,081,400 ("the '400 Patent"). The '349 Patent, entitled "Power Efficient Sustain Drivers and Address Drivers for Plasma Panel," was issued to UI as assignee on September 12, 1989 and lists as inventors Larry J. Weber, Kevin W. Warren and Mark B. Wood. Exh. A to Amended Complaint For Patent Infringement ("Amended Complaint"). The '400 Patent, also entitled "Power Efficient Sustain Drivers and Address Drivers for Plasma Panel," was issued to UI as assignee on January 14, 1992 and lists as inventors the same three individuals. Exh. B to Amended Complaint.

In 1985, UI entered into a Servicing Agreement ("the 1985 Servicing Agreement") with University Patents, Inc. ("UPI") granting UPI exclusive authority as UI's licensing agent. See Servicing Agreement, Exh. C to Complaint filed in International Trade Commission ("ITC Complaint"), attached as Exh. 5 to The University of Illinois' Request For Judicial Notice, filed October 18, 2002 [docket no. 164]; see also Amended Complaint For Patent Infringement ("Amended Complaint") at ¶ 13. UPI changed its name to Competitive Technologies, Inc. in 1994. Exh. A to ITC Complaint, attached as Exh. 5 to The University of Illinois' Request For Judicial Notice, filed October 18, 2002 [docket no. 164]; see also Amended Complaint at ¶ 13.

[ ] Exh. A to Declaration of Steven W. Richeson In Support Of Counterclaimants' Consolidated Opposition To Competitive Technologies, Inc.'s Motions To Dismiss ("Richeson Declaration").[4] [ [5] ]

Beginning in 1995 and continuing until 1999, Competitive [ ] engaged in licensing

---

**2.** Hereinafter, the motions listed above will be referred to as "the Competitive Motion," "the UI Motion" and the "Fujitsu Conditional Cross–Motion," respectively.

**3.** The parties agreed at oral argument that they have no objection to the Court taking judicial notice of any of the documents that were attached to the following requests for judicial notice: 1) Competitive's Request For Judicial Notice, filed June 28, 2002 [Docket No. 46]; 2) Fujitsu's Request For Judicial Notice, filed August 30, 2002, in support of its consolidated opposition to Competitive's Motion To Dismiss [Docket No. 82]; 3) UI's Request For Judicial Notice, filed October 18, 2002, in support of UI's Motion To Dismiss [Docket No. 164]; 4) UI's Request For Judicial Notice, filed November 19, 2002, in support of UI's Reply [Docket No. 244]. Accord-

ingly, the Court takes judicial notice of all of those documents, pursuant to F.R. Evid. 201.

**4.** Although Fujitsu did not request that the Court take judicial notice of [ ] the Court takes judicial notice of the existence of this document—though not the truth of any assertion contained in that [ ]—pursuant to Fed. R.Evid. 201(b)(2). See United States v. Wagner, 19 Fed.Appx. 542, 543 n. 1 (holding that judicial notice of manual was proper under Fed.R.Evid. 201(b) but that court could not take judicial notice of truth of contents of that document because it contained disputed facts). The Court notes that neither Competitive nor UI objected to either the authenticity of this document or to the Court considering the document in these motions.

**5.** Again, the Court takes judicial notice of the existence of [ ] pursuant to Fed.R.Evid.

negotiations for the '349 and '400 Patents with Fujitsu. Defendants' Amended Answer To Amended Complaint And Counterclaims ("Amended Answer") at ¶¶ 48, 55. Some of these negotiations were conducted by Competitive's "agent and affiliate in Japan," Innovation Partners International, Inc. Amended Answer at ¶ 98. [ ] Amended Answer at ¶ 52. [ ] Amended Answer at ¶ 87. The negotiations between Competitive and Fujitsu were unsuccessful.

In August, 2000, Matsushita and Fujitsu entered into a "comprehensive cross-license ... concerning PDP patents." Amended Answer at ¶ 49. The purpose of this cross-license was to achieve " 'patent peace' between the two companies." *Id.* [ ] Amended Answer at ¶ 54.

In September, 2002, (well after litigation of this action had commenced), UI and Competitive amended the Servicing Agreement. *See* Exh. A to Second Declaration of Reynaldo C. Barcelo in Support of the University's Opposition and Conditional Cross–Motion ("Second Barcelo Decl.") [Docket No. 127].[6] Pursuant to the Amended Servicing Agreement, Competitive's rights in the '349 and '400 Patents were terminated and reverted to UI. *Id.* Further, Competitive assigned to UI "any and all rights it may have to bring and maintain suit for past infringement." *Id.*

### B. *Procedural Background*

#### 1. The ITC Proceeding and the Illinois Action

On December 21, 2000, UI and Competitive filed an action in federal district court in the Central District of Illinois against the Fujitsu defendants, alleging infringement of the '349 and '400 Patents ("the Illinois action"). Two days later, on December 23, 2000, Competitive and the University lodged a complaint with the International Trade Commission ("ITC"), alleging that Fujitsu violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by importing goods that infringed the same patents. *In the Matter of Certain Plasma Display Panels, Plasma Panel Components, and Products Containing Same,* ITC Investigation No. 337–TA–445. On February 2, 2001, the district court stayed the Illinois action pending resolution of the claims pending before the ITC. *See* February 2, 2001 Order Granting Motion For A Mandatory Stay Provided By Statute.

The ITC initiated an investigation on January 22, 2001. Some discovery was conducted. Amended Answer at ¶ 63. On June 26, 2001, Competitive and UI withdrew their complaint before the ITC. *Id.* As a result, on September 25, 2001, the stay in the Illinois action was lifted.

After the stay was lifted in the Illinois action, Fujitsu filed four motions in that action: 1) a motion to dismiss for lack of personal jurisdiction; 2) a motion to dismiss for improper venue; 3) a motion seeking transfer to the Northern District of California; 4) a motion to dismiss UI for lack of standing. The district court granted Fujitsu's motion to transfer on April 2, 2002 and the Illinois action was transferred to this Court. The court did not rule on the remaining three motions.[7]

---

201(b)(2), even though Fujitsu did not include this document in any of the requests for judicial notice it filed in support of its briefs on the Motions addressed in this Order. Neither Competitive nor UI objected to the authenticity of this document or to its consideration by the Court.

**6.** The Court takes judicial notice of the existence of the Amended Servicing Agreement, pursuant to F.R. Evid. 201(b).

**7.** After transfer to this Court, Fujitsu withdrew its motion to dismiss for lack of personal jurisdiction. *See* May 21, 2002 Stipulated Order [Docket No. 21]. Subsequently, this

## 2. The Delaware Action and the JPML Petition

On September 10, 2001, Fujitsu brought an action against Competitive and another entity, Plasmaco, in federal district court in Delaware ("the Delaware action"), asserting claims related to the '349 and '400 Patents. Competitive brought motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), to consolidate the Delaware action with the Illinois action pursuant to 28 U.S.C. § 1404(a), or to stay the Delaware action pending resolution of the Illinois action. Similarly, Plasmaco brought a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Competitive also petitioned the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate the Illinois and the Delaware actions under 28 U.S.C. § 1407(a).

The JPML denied the petition to consolidate on April 16, 2002. On April 19, 2002, the district court in Delaware stayed the Delaware action pending resolution of the action in this Court. On May 22, 2002, Fujitsu filed a notice of dismissal pursuant to Fed.R.Civ.P. 41(a). On the same day, Fujitsu filed its answer in this Court, asserting as counterclaims against Competitive the same claims as had been asserted in the Delaware action. Competitive brought a motion seeking to vacate Fujitsu's voluntary dismissal in the Delaware action on August 23, 2002. That motion was denied on August 30, 2002, and the Delaware case was closed.

## C. *Fujitsu's Counterclaims*

Fujitsu asserted thirteen counterclaims against Competitive and UI in this action. The counterclaims are the same as to both UI and Competitive.[8] Fujitsu has asserted the following counterclaims:

First Counterclaim: Claim for declaratory judgment re invalidity of '349 Patent claims;

Second Counterclaim: Claim for declaratory judgment re non-infringement of '349 Patent claims;

Third Counterclaim: Claim for declaratory judgment re invalidity of '400 Patent claims;

Fourth Counterclaim: Claim for declaratory judgment re non-infringement of '400 Patent claims;

Fifth Counterclaim: Claim for declaratory judgement re unenforceability of '349/'400 Patents;

Sixth Counterclaim: Breach of confidentiality based on disclosure of information concerning "pendency and timing" of licensing negotiations between Competitive and Fujitsu;

Seventh Counterclaim: Misappropriation of trade secrets based on disclosure of information "concerning the existence, status, and/or substance of the confidential business discussions" between Fujitsu and Competitive;

Eighth Counterclaim: Fraud based on allegedly intentional concealment of [ ] and on representation that [ ]

Ninth Counterclaim: Negligent misrepresentation based on same alleged misrepresentations as Eighth Counterclaim;

Tenth Counterclaim: Unfair competition re '349 Patent based on filing of patent infringement complaint before

---

Court denied as moot the motion to dismiss for lack of standing. *See* November 19, 2002 Stipulated Order [Docket No. 236]. Because Competitive had assigned all of its rights to UI, Competitive's infringement claims were dismissed, as were Fujitsu's first five counterclaims against Competitive. *See* November 19, 2002 Order [Docket No. 242].

**8.** As noted above, the first five counterclaims, for declaratory relief, were dismissed as to Competitive when Competitive's patent infringement claims were dismissed. *See* 11/19/02 Order.

the ITC that was allegedly "baseless" and "without merit";

Eleventh Counterclaim: Unfair competition re '400 Patent based on filing of patent infringement complaint before the ITC that was allegedly "baseless" and "without merit";

Twelfth Counterclaim: Abuse of process re '349 Patent based on initiation of ITC proceeding, knowing '349 Patent was invalid and not infringed, for improper purposes, including to obtain a quick settlement and discovery through the ITC proceeding;

Thirteenth Counterclaim: Abuse of process re '400 Patent based on initiation of ITC proceeding, knowing '349 Patent was invalid and not infringed, for improper purposes, including to obtain a quick settlement and discovery through the ITC proceeding.

## D. *The Motions*

### 1. Competitive's Motion

In its Motion, Competitive seeks dismissal of Counterclaims Six through Thirteen. First, Competitive asserts that this Court does not have supplemental subject matter jurisdiction over these counterclaims because they are not sufficiently related to UI's patent infringement claims. Competitive argues further that even if the Court *could* exercise supplemental jurisdiction over these counterclaims, it should decline to do so for a variety of reasons.

Second, Competitive asserts that Fujitsu fails to state a claim under Fed. R.Civ.P. 12(b)(6) as to Counterclaims Six through Thirteen. In particular, Competitive makes the following arguments: 1) Fujitsu fails to state a claim for breach of confidentiality (Counterclaim Six) because Fujitsu does not allege facts showing a duty on the part of Competitive to maintain confidentiality; 2) Fujitsu fails to state a claim for misappropriation of trade secrets (Counterclaim Seven) because Fu-

jitsu has alleged no facts showing the existence of any trade secret; 3) Fujitsu fails to state a claim for fraudulent misrepresentation (Counterclaims Eight) because it has not alleged the claim with particularity and has not alleged either that the misrepresentation was made for the purpose of inducing Fujitsu to act on it or that Fujitsu was damaged as a result of its reliance on the alleged misrepresentation; 4) Fujitsu fails to state a claim for negligent misrepresentation (Counterclaim Nine) because Fujitsu does not allege that the misrepresentations were made for the guidance of Fujitsu or that Fujitsu relied on the statements, and because Competitive owed no legal duty to Fujitsu to avoid wrongdoing; and 5) Fujitsu fails to state a claim for unfair competition and abuse of process (Counterclaims Ten through Thirteen) based on the *Noerr–Pennington* doctrine, federal preemption and because Fujitsu has alleged insufficient facts to state a claim for unfair competition or abuse of process.

In its Opposition, Fujitsu argues that this Court has jurisdiction over Counterclaims Six through Thirteen on the basis of diversity, and therefore, that Competitive's arguments concerning supplemental jurisdiction are superfluous. In response to Competitive's assertion that Fujitsu fails to state a claim as to Counterclaims Six through Thirteen, Fujitsu makes the following arguments: 1) Fujitsu has stated a claim for breach of confidentiality (Counterclaim Six) because there was an implied-in-fact contract between Competitive and Fujitsu, even if there was no written contract, under which their licensing negotiations were not to be revealed to third parties; 2) Fujitsu has stated a claim for misappropriation of trade secrets (Counterclaim Seven) because Fujitsu has alleged sufficient facts to establish that the pendency and substance of negotiations between Competitive and Fujitsu consti-

tuted a trade secret; 3) Fujitsu has alleged sufficient facts to satisfy all of the required elements for intentional and negligent misrepresentation (Counterclaims Eight and Nine); and 4) Fujitsu has stated claims for unfair competition and abuse of process (Counterclaims Ten through Thirteen) because there is no federal preemption, the *Noerr–Pennington* doctrine does not apply, and Fujitsu has alleged sufficient facts to state claims for unfair competition and abuse of process.

In its Reply, Competitive asserts that there is no jurisdiction over Fujitsu's Counterclaims Six through Thirteen because this Court does not have personal jurisdiction over Competitive as to those claims and venue in this Court is improper. Competitive argues further that the Court should decline to exercise supplemental jurisdiction over these counterclaims.

## 2. UI's Motion

UI raises many of the issues that are raised in the Competitive Motion, as well as a number of additional issues. First, UI asserts that it is an arm of the state and therefore, that it enjoys Eleventh Amendment immunity. UI argues further that because Counterclaims Six through Thirteen are permissive rather than compulsory, UI has not waived Eleventh Amendment immunity as to these counterclaims by asserting patent infringement claims against Fujitsu.[9] Second, UI asserts that there is no subject matter jurisdiction over Counterclaims Six through Thirteen. In particular, UI asserts that: 1) there is no diversity jurisdiction because UI is not a citizen for the purposes of diversity; and 2) there is no supplemental jurisdiction because these counterclaims do not arise out of the same "case or controversy" as UI's claims, as required under 28

U.S.C. § 1367(a). UI argues further that even if these counterclaims do arise out of the same "case or controversy," this Court should decline to exercise jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367(c), on the basis that they are likely to "substantially predominate" over the patent infringement claims. Third, UI asserts that Counterclaims Six through Thirteen should be dismissed for failure to state a claim, asserting many of the same arguments that are asserted by Competitive. Fourth, UI argues that Counterclaim Five (seeking a declaration that two patents are unenforceable based on patent misuse) should be dismissed and Fujitsu's Tenth Affirmative Defense (inequitable conduct) should be stricken under the Federal Circuit's decision in *Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369 (Fed.Cir.2001). Finally, UI asserts that Counterclaims Ten through Thirteen are barred by California state law privileges, including the California anti-SLAPP statute.

In its Opposition, Fujitsu makes the following arguments: 1) UI is not an arm of the state for the purposes of Eleventh Amendment immunity, and even if it is, UI has waived sovereign immunity as to Fujitsu's counterclaims; 2) UI is a citizen for the purposes of diversity jurisdiction and therefore, there is diversity jurisdiction over all of the counterclaims; 3) even if there is no diversity jurisdiction, the Court may exercise supplemental jurisdiction over Counterclaims Six through Thirteen; 4) Counterclaims Six through Thirteen properly state claims; 5) California state law privileges do not apply to Counterclaims Ten through Thirteen, and even if they did, those privilege do not bar these counterclaims; and 6) neither the Fifth

---

**9.** UI concedes in its Motion that it has waived sovereign immunity as to Counterclaims One through Five. UI Motions at 6.

Counterclaim nor the Tenth Affirmative Defense are barred by the Federal Circuit's decision in *Aptix v. Quickturn,* 269 F.3d 1369 (Fed.Cir.2001).

### 3. Fujitsu's Conditional Cross–Motion

In its Conditional Cross–Motion, Fujitsu argues that if the Court determines that California's anti-SLAPP statute applies, the Court should delay setting a probability hearing to allow for discovery. UI, on the other hand, asserts that if the anti-SLAPP statute applies, a probability determination can be made without waiting for any discovery to be completed.

## III. *ANALYSIS*

### A. *UI's Entitlement to Eleventh Amendment Immunity*

### 1. Legal Standard

█ The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has held that the Eleventh Amendment stands for the proposition that "federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." *Seminole Tribe v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quotation omitted). To qualify for Eleventh Amendment immunity, a defendant must establish that it is both an arm of the state and that its right to immunity has neither been waived by the state nor abrogated by Congress.

### a. *Arm of the State*

█ The Eleventh Amendment protects the state and its agencies from being sued, but does not protect municipalities and other political subdivisions of the state. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To determine whether or not an entity is an arm of the state for the purposes of the Eleventh Amendment, courts look to a number of factors, the most important of which is "whether the named plaintiff has such independent status that a judgment against the defendant would not impact the state treasury." *Jackson v. Hayakawa,* 682 F.2d 1344, 1349 (9th Cir.1982). Other factors include "performance by the entity of an essential government function, its ability to sue or be sued, its power to take property in its own name or in the name of the state, and its corporate status." *Mukaida v. Hawaii,* 159 F.Supp.2d 1211, 1221 (D.Haw.2001) (citing to *Jackson,* 682 F.2d at 1349) (holding that the University of Hawai'i was an arm of the state for purposes of Eleventh Amendment).

The "facts" which form the basis of the immunity analysis are found in state law. To determine whether "a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore 'one of the United States,' within the meaning of the Eleventh Amendment ... [the court must consider] the provisions of state law that define the agency's character." *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *see also Doe v. Lawrence Livermore Nat'l Lab.,* 65 F.3d 771, 777 (9th Cir.1995) (noting in dissent that by focusing on who is legally obligated rather than on who actually pays, the court can resolve the threshold question of Eleventh Amendment immunity based on the pleadings and the

state statutes), *rev'd* 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (citing to dissent with approval). Thus, for example, when determining whether or not a judgment will be satisfied from state funds, the Supreme Court instructs that the court is to ask whether, under state law, a judgment would impose *legal liability* on the state. *Id.* The Court in *Doe* held that it was irrelevant to Eleventh Amendment immunity analysis that the judgment might not actually be paid by the state, for example, if the judgment would be covered by insurance proceeds or there was a right to indemnification. *Id.* at 431, 117 S.Ct. 900.

### b. *Waiver*

A defendant that establishes that it is an arm of the state is entitled to sovereign immunity unless one of two exceptions applies. First, Congress may explicitly abrogate Eleventh Amendment sovereign immunity in exercising its power to enforce the Fourteenth Amendment.[10] *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 669, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Second, a state may waive its sovereign immunity by consenting to suit. *Id.* Such a waiver may be based on a "clear declaration" by the state that it consents to federal jurisdiction or may be based on the state's conduct. *Id.* at 675–676, 119 S.Ct. 2219; *see also In re Bliemeister,* 296 F.3d 858, 860 (9th Cir.2002).

Waiver based on conduct is found in a variety of situations. First, it is well-established that sovereign immunity is waived where the state invokes the jurisdiction of the federal courts by filing claims in federal court. *See Lapides v. Bd. of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 1643, 152 L.Ed.2d 806 (2002) (holding that for the purposes of waiver of Eleventh Amendment immunity, a state invokes the jurisdiction of a federal court—and thus waives immunity—not only when it files claims in federal court but also when it removes to federal court claims that have been filed against it in state court). Where a state invokes the jurisdiction of the federal courts, it waives sovereign immunity not only as to the state's claims, but also as to counterclaims that arise out of the same transaction or occurrence, that is, compulsory counterclaims. *In re Lazar,* 237 F.3d 967, 978 (9th Cir.2001) (citing to cases decided by the Fourth, Seventh and Tenth Circuits on this issue and to Fed.R.Civ.P. 13(a)); *see also Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931 (Fed.Cir.1993) (holding in patent infringement action that state's sovereign immunity was waived as to its own patent infringement claims and compulsory counterclaims brought against it but not as to permissive counterclaims).[11] Even where the state has not affirmatively invoked the jurisdiction of the federal courts, its participation in litigation brought against it may result in waiver if the state's participation

---

**10.** Fujitsu does not argue that Congress has abrogated Eleventh Amendment immunity as to Counterclaims Six through Thirteen.

**11.** The Ninth Circuit has not reached the question of whether the scope of the waiver with respect to compulsory counterclaims is limited to recoupment of damages obtained by the state or goes further to allow an affirmative award of damages against the state. *Id.* However, the Federal Circuit and the Seventh Circuit have held that the waiver extends only to the extent of defeating the state's

claim. *See In re Lazar,* 237 F.3d at 978 (citing to *Jones v. Yorke (In re Friendship Medical Center Ltd.),* 710 F.2d 1297, 1301 (7th Cir. 1983); *Genentech,* 998 F.2d at 946). In addition, some district courts in the Ninth Circuit have concluded that the waiver would only allow for recoupment. *See, e.g., California Independent System Operator Corp. v. Reliant Energy Services, Inc.,* 181 F.Supp.2d 1111, 1124 (E.D.Cal.2001)(stating in dicta that any possible waiver of sovereign immunity would be limited to "compulsory recoupment counterclaims").

is incompatible with an intent to preserve its sovereign immunity. *In re Bliemeister*, 296 F.3d at 860.

### 2. Is UI an Arm of the State for Purposes of Sovereign Immunity?

■ UI asserts that it is an arm of the state for the purposes of sovereign immunity, relying on Seventh Circuit cases that have reached that conclusion. *See Cannon v. Univ. of Health Scis./The Chicago Med. Sch.*, 710 F.2d 351, 356 (7th Cir.1983) (holding that claims against the Board of Trustees of the University of Illinois were barred by the Eleventh Amendment); *Kroll v. Bd. of Trs. of Univ. of Ill.*, 934 F.2d 904, 908 (7th Cir.1991) (citing to *Cannon* and holding that Board of Trustees of the University of Illinois is a state agency and therefore subject to Eleventh Amendment immunity); *see also Loeffler v. Univ. of Ill. at Chicago*, 36 F.Supp.2d 1058 (N.D.Ill.1999) (citing to *Cannon* and holding that the University if Illinois is entitled to Eleventh Amendment immunity). Fujitsu argues that these cases do not apply the "searching multi-factor analysis that is required for a proper determination of whether an entity is the State" and that if such an analysis is applied, it points to the conclusion that the University of Illinois is not an arm of the state. The Court concludes that UI is an arm of the state of Illinois.

In *Cannon*, 710 F.2d at 356, the Seventh Circuit held that UI is a state agency and therefore, entitled to Eleventh Amendment immunity. In support of this conclusion, the court cited a single state court decision, *Elliott v. Univ. of Ill.*, 365 Ill. 338, 6 N.E.2d 647 (1936). The court also noted that the district court had relied on the "powers and duties" of the Board of Trustees, as set forth in chapter 144 of the Illinois Revised Statutes, currently codified at 110 ILCS § 305 ("the University of Illinois Act"), in support of its conclusion that UI was immune under the Eleventh Amendment. However, the court in *Cannon* did not explain what "powers and duties" gave rise to such a result. Nor did the court conduct any analysis of its own on this question. 710 F.2d at 356. The court also concluded, without analysis or citation of any specific state law, that "because the state universities are the alter ego of the state, any damage award chargeable to university assets is an award against the state itself." *Id.* at 357.

In *Elliott* (the case on which the *Cannon* court relied), the plaintiff challenged an Illinois law, the Accountancy Act, which authorized UI to determine the qualifications for certified public accountants and administer an examination in accounting for those seeking to be designated as certified public accountants. 365 Ill. at 340, 6 N.E.2d 647. The plaintiff argued, among other things, that the Accountancy Act was invalid because it conferred ultra vires powers on UI. *Id.* at 343, 6 N.E.2d 647. The court rejected that argument:

Much time is devoted in the argument to the contention that the powers conferred on the University in holding examinations and granting certificates are ultra vires. The University is not a private corporation but is an agency of the State. It was founded by an act of the Legislature approved February 28, 1867 (Smith–Hurd Ill.Stats. c. 144, § 22 et seq. and notes), as the "Illinois Industrial University." In 1885 (Smith–Hurd Ill. Stats. c. 144, § 48) its name was changed to "University of Illinois." It is maintained by interest from its permanent endowment fund arising from grants of land from the United States and by appropriations from the General Assembly. It is governed by a board of trustees elected by the people. It is managed by a corporation created by the State, *but the State retains the power of selecting trustees, and may through other agents than the trustees*

*sell and dispose of its property or change its charter as the Legislature may direct. People v. University of Illinois, 328 Ill. 377, 382, 159 N.E. 811.* The Legislature had full power to direct the University, as the state's agent, to perform the duties enjoined upon it by the act of 1903.

*Id.* at 343–344, 6 N.E.2d 647 (emphasis added).

Although the language of *Elliott* supports the conclusion that UI is an arm of the state, the court in *Elliott* did not directly address the question of whether a judgment against UI would result in expenditure of state funds, which is an important consideration in determining whether an entity is entitled to Eleventh Amendment immunity. *See Jackson v. Hayakawa,* 682 F.2d at 1349. This issue is addressed in *People ex rel. Olmsted v. State of Illinois,* 328 Ill. 377, 159 N.E. 811 (1928).

*Olmsted* lends support to the conclusion that under Illinois law a judgment against the University is the same as a judgment against the state because the University is the alter ego of the state. In *Olmsted,* the court explicitly held that UI's property is state property. *Id.* In particular, the court in *Olmsted* stated as follows:

Does this property belong to the state? The University of Illinois was founded by an act of the Legislature approved February 28, 1867 (Pub. Laws 1867, p. 123), as the Illinois Industrial University. In 1885 (Laws 1885, p. 252), its name was changed to the University of Illinois. It is maintained by interest from its permanent endowment fund arising from grants of land from the United States and by appropriations made by the General Assembly. It is governed by a board of trustees elected by the people. Though the state has created a body corporate to control the University of Illinois, yet the state re-

tains the power of selecting trustees, and may, through other agents than the trustees, sell and dispose of the property of the institution or change its charter as the Legislature may direct. *The property of the University of Illinois, though held by the board of trustees, belongs to the state. People v. Board of Trustees,* 283 Ill. 494, 119 N.E. 595 [(1918)]; *Spalding v. People,* 172 Ill. 40, 49 N.E. 993 [(1898)]; *Board of Trustees v. Champaign County,* 76 Ill. 184 [(1875)]; *Thomas v. Industrial University,* 71 Ill. 310 [(1874)]. While the state, through its board of trustees, is virtually a trustee of the property and funds ... the university for the use of the people, it nevertheless has power to resume the fund and to use it for the purposes designated. *City of Chicago v. People,* 80 Ill. 384 [(1875)].

*Id.* at 382, 159 N.E. 811 (italics added). Under this precedent, as a matter of law, the property of UI is the property of the state. A judgment against UI, therefore, necessarily runs against state property.

Fujitsu argues that UI is not entitled to sovereign immunity because it has been held to be separate and independent from the state, citing to *People ex rel. Bd. of Trs. of Univ. of Ill. v. Barrett,* 382 Ill. 321, 46 N.E.2d 951 (1943). *Barrett* does not support Fujitsu's position. To the contrary, much of the discussion in *Barrett* supports the opposite conclusion. In *Barrett,* a dispute arose as to whether UI should be represented in pending litigation by the Attorney General of the state of Illinois or by attorneys who had been hired by UI's Board of Trustees. *Id.* at 324, 46 N.E.2d 951. The Attorney General attempted to fire two attorneys who had been hired by the Trustees. The Trustees brought a petition for mandamus seeking to compel the Auditor of Public Accounts to pay the attorneys' salaries and to prevent the Attorney General from interfering

with their work. *Id.* The Court held that UI was entitled to retain its own attorneys because, "[i]n the sense that it is a department or branch of the state government, [UI] is not an agency or instrumentality of the State." *Id.* at 347, 46 N.E.2d 951. Rather, the court held, UI "[i]s a separate corporate entity, which functions as a public corporation." *Id.*

Fujitsu relies on the language quoted above in support of its argument that UI is not entitled to sovereign immunity because it is not an arm of the state. However, the court's lengthy discussion of the relationship between UI and the state leading up to its holding in *Barrett* shows that Fujitsu's reliance on this language is misplaced. In particular, the court characterizes UI as follows:

> While it is a public corporation, it was organized and exists for one specific purpose. *It is unique in that it has and can own no property in its own right. Whatever property or interest in property it acquires belongs to the State, and is held by it as trustee for the use of the State.* It has no taxing powers and no means of raising money or acquiring property, except through the operation of the university. Its power to borrow money and to issue bonds is granted and limited by the act of June 4, 1941. Ill.Rev.Stat.1941, chap. 144, par. 71 et seq. *True, it may receive donations and gifts, but whatever it may receive as such, like all other property which it acquires, it holds only as trustee for the State, the beneficial owner.* It has no power to select its own trustees or managers. This power is reserved to the State. It functions solely as an agency of the State for the purpose of the operation and administration of the university, for the State. In doing this, it functions as a corporation, separate and distinct from the State and as a public corporate entity with all the powers enumerated in the applicable statutes, or necessarily incident thereto. It has and can exercise no sovereign powers. It is no part of the State or State government. As definitely held by this court in *Spalding v. People, supra,* by establishing the university the State created an agency of its own through which it proposed to accomplish certain educational objects, and the corporate entity created for that purpose is a public corporation belonging to the class of corporations enumerated in section 80 of division I of the Criminal Code Ill.Rev Stat.1941, chap. 38, par. 214. Its contractual powers are so restricted by statute that it can create no liability or indebtedness against the State and no liability or indebtedness against itself as a corporate entity in excess of the funds in the hands of the treasurer of the university at the time of creating such liability or indebtedness and which may be specially and properly applied to the payment of the same. Ill.Rev.Stat.1941, chap. 144, par. 28. No suit can be maintained against it which would adversely affect the rights of the State. *Schwing v. Miles,* 367 Ill. 436, 11 N.E.2d 944, 113 A.L.R. 1504 [(1937)].

*Id.* at 342–343, 46 N.E.2d 951 (emphasis added). While far from clear, this language supports the conclusion that the property of UI belongs to the state as a matter of law.

Fujitsu also argues that regardless of the holdings of the state court cases discussed above, application of the five-factor test set forth in *Jackson v. Hayakawa,* supports the conclusion that UI should not be considered an arm of the state. 682 F.2d at 1350. The Court disagrees.

The factor that is given the greatest weight in determining whether an agency is an arm of the state for Eleventh Amendment purposes is whether or not state funds would be threatened. *Id.* As noted

above, this inquiry is not a factual inquiry to determine where funds would actually come from in the event that liability were established. Rather, the court looks to whether a judgment would impose legal liability on the state. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. at 430–431, 117 S.Ct. 900. Moreover, the funds need not be taken " 'literally out of the general treasury' so long as they are, in fact, 'state-held funds' otherwise available to the state." *Vaughn v. Regents of the Univ. of Cal.*, 504 F.Supp. 1349, 1353 n. 5 (E.D.Cal. 1981) (quoting *Wade v. Miss. Co-op. Extension Service*, 424 F.Supp. 1242, 1257 (N.D.Miss.1976)).

Here, the Court concludes that the first factor—whether or not state funds will be threatened—supports the conclusion that UI is an arm of the state. Under Illinois law, UI acts as an alter-ego for the state. As noted above, the rationale in *Cannon* was that the University is an alter-ego of the state and therefore, any funds that are taken from its treasury are, by definition, state funds. This reasoning, in turn, is supported by cases decided by Illinois state courts, albeit not necessarily in the context of Eleventh immunity analysis.

Fujitsu asserts that this reasoning is circular. Essentially, the "alter ego" argument assumes the proposition to be proven: that the funds are state funds. While Fujitsu's argument has some force, it is not supported by authority and cannot withstand analysis. First, state law precedent holds that property of UI is the property of the state. This conclusion is dispositive as to the first factor in the immunity analysis: a judgment against UI is against state funds. Moreover, a number of courts, in addition to *Cannon*, have relied on the same alter-ego theory to conclude that a university was an arm of the state. *See, e.g., Vaughn*, 504 F.Supp. at 1354 (holding that University of California is arm of the state based, in part, on fact

that "although the Regents is vested with legal title to the University's property ... all the University's property is property of the state" under the California constitution and noting that "[t]he majority of federal courts which have considered the 'alter-ego' relationship of a state university to its state have concluded that a suit against the university is a suit against the state for purposes of the Eleventh Amendment"); *Hutsell v. Sayre*, 5 F.3d 996, 1002 (6th Cir.1993) (holding that University of Kentucky was entitled to Eleventh Amendment immunity based, in part, on fact that all funds collected by the University were deemed state funds under Kentucky statute).

The Court is not persuaded by Fujitsu's assertion that UI may not be an arm of the state because it has authority under Illinois law to acquire, hold, sell, lease and convey real and personal property without state approval. *See* Fujitsu Surreply at 2 (citing to 110 ILCS §§ 305/1, 305/7d, 420/1(f)). As the court in *Barrett* made clear, UI's organizational independence from the State of Illinois as a public corporation does not preclude it from being an alter-ego of the state for the purposes of ownership.

The Court also rejects Fujitsu's assertion that UI has not established that it performs any essential governmental function—the second factor in the five-factor test. *See Jackson v. Hayakawa*, 682 F.2d at 1349. The cases that have addressed the issue have held, almost uniformly, that the provision of higher education is an essential governmental function for the purposes of Eleventh Amendment immunity analysis. *See, e.g., Hutsell*, 5 F.3d at 1002 (holding that "higher education has long been recognized as a governmental function"); *Kovats v. Rutgers*, 822 F.2d 1303, 1310 (3d Cir.1987) (holding that Rutgers University was not an arm of the state but recognizing that "providing edu-

cation has long be recognized as a function of state government"). Similarly, this Court finds that in providing higher education, UI performs an essential governmental function.

Fujitsu is correct that UI's ability to sue and be sued points to the conclusion that UI is not an arm of the state. *See* 110 ILCS § 305/1. However, it is clear from the numerous cases that have found universities to be arms of the state notwithstanding their ability to sue and be sued, that this factor is not dispositive. *See, e.g., Kashani v. Purdue Univ.*, 813 F.2d 843, 847 (7th Cir.1987) (holding that Purdue University was arm of the state even though it could sue and be sued); *United Carolina Bank v. Bd. of Regents of Stephen Austin State Univ.*, 665 F.2d 553, 559 (5th Cir.1982) (holding that the university was entitled to Eleventh Amendment immunity even though it had the right to sue and be sued).

The fourth factor is whether an agency can hold property in its own name. *See Jackson v. Hayakawa*, 682 F.2d at 1349. Fujitsu cites to state laws that show UI can hold property in its own name, and UI does not appear to dispute this point. This factor points to the conclusion that UI is not entitled to Eleventh Amendment immunity. However, like the question of whether the University can sue and be sued, this factor is not dispositive.

The fifth factor is the corporate status of the entity. *Id.* Here, it is undisputed that UI is a public corporation. In light of the fact that UI is a public corporation rather than a private corporation, however, the Court does not find that this factor provides strong support for either the conclusion that UI is an arm of the state or the conclusion that it is not.

Finally, the Court rejects Fujitsu's assertion that even if UI would otherwise be entitled to Eleventh Amendment immunity, it has waived its sovereign immunity by invoking diversity jurisdiction in other actions, thus representing itself as a citizen rather than a state.[12] While UI's conduct in *this* litigation could give rise to waiver (as discussed above), Fujitsu has cited to no authority in support of the proposition that UI's conduct in a separate action could result in waiver of Eleventh Amendment immunity in this action. Nor does there appear to be any such authority.

In short, applying the five-factor test articulated in *Jackson v. Hayakawa*, the Court concludes that UI is entitled to assert sovereign immunity under the Eleventh Amendment.

### 3. Has UI Waived Sovereign Immunity as to Counterclaims Six Through Thirteen?

UI asserts that Counterclaims Six through Thirteen are not sufficiently related to its own patent infringement claims to make them compulsory counterclaims, and therefore it has not waived sovereign immunity as to these counterclaims. Fujitsu, on the other hand, asserts that all of its counterclaims are compulsory.[13] This is

---

**12.** As discussed below, diversity jurisdiction can exist only if UI is a citizen and not if it is a state.

**13.** Fujitsu also argues that, even if these counterclaims are not strictly compulsory, UI's waiver should extend to these claims. Fujitsu asserts that the Supreme Court's recent decision in *Lapides,* and the fact that this case involves conduct by a state beyond its own borders, supports this position. The Court is

not persuaded by Fujitsu's argument. In support of its argument, Fujitsu cites to language in *Lapides* in which the Supreme Court states that it would be unfair to allow the state to contend at the same time that: 1) the judicial power of the United States extends to the case at hand; and 2) the state is entitled to sovereign immunity on the basis that the judicial power does not extend to the case at hand. 122 S.Ct. at 1643. Fujitsu asserts that because the conduct here was committed out-

the axis of the dispute: to determine whether or not the counterclaims arise out of the same transaction or occurrence as the infringement claims, should the Court consider the facts underlying Fujitsu's affirmative defenses? UI answers this question in the negative, while Fujitsu responds in the affirmative.

UI also argues that: (1) even if affirmative defenses are considered, Fujitsu's counterclaims are not sufficiently related to its affirmative defenses to make them compulsory counterclaims; and (2) abuse of process claims are compulsory counterclaims only in the proceeding in which the process was alleged to have been abused. Each argument is addressed below in turn.

a. *Should Affirmative Defenses Be Considered?*

■ Rule 13(a) states that "a pleading shall state as a counterclaim any claim ... the pleader has against any opposing party if it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." To determine if claims arise out of the same transaction or occurrence, courts in the Ninth Circuit ask whether "the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all of the issues be resolved in one lawsuit." *Pochiro v. Prudential Ins. Co. of America*, 827 F.2d 1246, 1249 (9th Cir.1987). "The test is a 'flexible' one taking into account all of the circumstances in light of the purposes of Rule 13(a)." *Grumman Sys. Support Corp. v. Data Gen. Corp.*, 125 F.R.D. 160, 162 (N.D.Cal.1988) (citing *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926); *Warshawsky & Co. v. Arcata Nat'l Corp.*, 552 F.2d 1257 (7th Cir.1977)). Among the factors courts consider in determining whether the test is met is whether "the facts necessary to prove the two claims substantially overlap, [and whether] the collateral es-

side of the state of Illinois, UI could be sued in state court in a state other than Illinois. Fujitsu argues it would be unfair to require Fujitsu to defend its patent infringement claims in federal court (where UI has waived sovereign immunity) while requiring Fujitsu to bring its counterclaims in a state court. Therefore, Fujitsu believes, the situation here is similar to the situation in *Lapides*.

There are two flaws in Fujitsu's argument. First, *Lapides* addressed a very specific set of facts that do not apply here. In particular, in *Lapides*, the state removed an action from state court to federal court asserting that the federal court could exercise jurisdiction over the state with respect to the claims asserted in that action. 122 S.Ct. at 1642. Once in federal court, the state asserted that it was entitled to sovereign immunity as to the very claims it had removed to federal court. *Id.* The Court held that allowing the state to remove an action and then assert sovereign immunity as to the claims asserted in that action would give rise to "seriously unfair result." *Id.*, 122 S.Ct. at 1643. The Court held that the state could not both assert and deny federal jurisdiction. Here, the state does not seek to assert sovereign immunity as to the very same claims for which it invoked federal jurisdiction. Rather, UI is seeking to limit its waiver to counterclaims that arise out of the same transaction or occurrence. The kind of unfairness that was at issue in *Lapides* is not present here.

Further, Fujitsu's argument that waiver of sovereign immunity extends to permissive counterclaims because the conduct at issue took place outside of the state's borders is unsupported by any authority (as Fujitsu concedes). Moreover, Fujitsu does not address why this fact would support the conclusion that the holding of *In re Lazar*—where the Ninth Circuit expressly held that waiver extends only to compulsory counterclaims—would not apply. The Court does not find anything in the reasoning of *In re Lazar* that suggests that the distinction Fujitsu draws here has any significance or would give rise to a different result.

toppel effect of ... the first action would preclude [the claims from being brought in a later action]." *Pochiro,* 827 F.2d at 1251.

In support of its argument that affirmative defenses should not be considered, UI cites to the following language in *In re Lazar:*

> A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant.

237 F.3d at 978. This language, however, is ambiguous. The court does not explain whether it is using the word "claim" to refer only to the elements to be proven by the plaintiff, or to include defenses that must be proven by a defendant.

In support of the proposition that the court should consider whether or not the counterclaims are based on the same facts as the affirmative defenses, Fujitsu cites to *Pochiro,* 827 F.2d 1246 (9th Cir.1987). In *Pochiro,* Defendant Prudential Insurance Company sued a former employee, John Pochiro, and his wife in state court. Prudential alleged that the defendants appropriated confidential customer information obtained while Mr. Pochiro worked for Prudential, and sought to enjoin the Pochiros from using its confidential records. 827 F.2d at 1248. Subsequently, the Pochiros sued Prudential, bringing claims including defamation and abuse of process against Mr. Pochiro's former employer. *Id.* The Pochiros alleged, among other things, that Prudential had called Mr. Pochiro a "crook" and had engaged in wrongful conduct—including filing a lawsuit against him—intended to damage the Pochiros' competing insurance business. *Id.* The court of appeals held that the Pochi-

ros' claims were properly dismissed by the district court because they were compulsory counterclaims in the action brought by Prudential. *Id.*

In reaching the conclusion that the Pochiros' claims were compulsory counterclaims, the court compared the facts underlying Prudential's claims and those underlying the Pochiros' claims. The court stated:

> In its state court action, Prudential pleaded causes of action for breach of employment contract, unfair competition, and intentional interference with business relations. The operative facts underlying these causes of action were that John Pochiro, when employed by Prudential as an agent, was given confidential records about Prudential's present and prospective policyholders. Then, after resigning from Prudential, Pochiro failed to return the records to Prudential and instead used them in soliciting business in competition with Prudential.

Prudential argues that the operative facts underlying the Pochiros' action also revolve around the Pochiros' use of these same confidential records. We agree. Although the Pochiros' complaint is rather jumbled, their causes of action for unlawful restraint of trade, unfair business practices, intentional interference with contractual advantage, defamation, abuse of process, intentional infliction of emotional distress, and tortious breach of employment contract are bottomed on a single paragraph of factual allegations, which we quote in full:

> Commencing in December, 1982 and January–February, 1983, Prudential deliberately, maliciously, willfully and/or with gross, wanton and negligent conduct set about to substantially damage John's reputation, credibility and business; that Prudential's

wrongful conduct included it doing the following acts: (1) Prudential told John's employees and/or prospective employees that John was a crook, and/or was dishonest and threatened them with litigation involvement or economic difficulty if they worked for John; (2) Prudential told insurance customers that John was a crook, dishonest, and/or unscrupulous and that if they did business with him they would suffer losses; (3) Prudential encouraged one customer to file a complaint, without justification, against John at the Arizona Insurance Commissioner; (4) Prudential used delay tactics in paying its own policyholders to prevent them from converting existing Prudential policies and doing business with John; (5) Prudential unjustifiably tried to persuade [sic] other insurance companies not to do business with John; (6) Prudential abused the process of the Arizona court system by bringing a lawsuit against John for the ulterior purpose of using it as a tool to dissuade persons from doing business with John; (7) Prudential told customers of John that if they did business with him they would be involved in litigation; (8) Prudential in bad faith delayed and/or failed to make payments to John under John's own insurance policy with Prudential and stopped payment on at least one such check, wrriten [sic] in favor of an ambulance service. Excerpt of Record (E.R.) at 7–8. Although some of these allegations at first blush appear a bit removed from Prudential's action to enjoin the Pochiros' use of confidential records, it is undisputed that Pochiro's use of Prudential's customer records is inextricably intertwined with the facts as alleged in the Pochiros' complaint. For example, the Pochiros' allegations that Prudential called John Pochiro "a crook" relate to Prudential's litigated claim that Pochiro misappropriated confidential records. *Id.* at 1250.

*Pochiro* does not explicitly address whether defenses should be considered in determining whether counterclaims are compulsory. However the court did construe the "transaction or occurrence" that gave rise to the state court action rather broadly: it included affirmative allegations in the federal suit that Prudential engaged in misconduct related to the claimed misappropriation.

A district court case cited by Fujitsu, *Grumman Systems Support Corp. v. Data General Corp.*, 125 F.R.D. 160 (N.D.Cal. 1988), supports the conclusion that affirmative defenses should be considered. In *Grumman,* the defendant, Data General, sued Grumman in Massachusetts for copyright infringement. *Id.* While that action was still pending, Grumman sued Data General in the Northern District of California. *Id.* Data General moved to dismiss the California action on the basis that the claims asserted by Grumman in the California action were compulsory counterclaims in the Massachusetts action. *Id.* The court agreed. The court's conclusion in *Grumman* was based upon the fact that Grumman's claims in the California action were substantially the same as an affirmative defense asserted by Grumman in the Massachusetts action. *Id.* at 162. The court went on to hold that the claims in the California action were compulsory counterclaims even though Grumman alleged additional facts in support of its claims in the California action. *Id.*[14]

14. UI seems to suggest that *Pochiro* and *Grumman* do not apply here because they do not involve Eleventh Amendment immunity, which requires waiver to be strictly construed. However, UI cites to no authority which suggests that the rule announced in *In re Lazar*—that Eleventh Amendment immunity is waived as to compulsory counterclaims—carries with it some stricter test for

The Federal Circuit's decision in *Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931 (Fed.Cir.1993), and the subsequent district court decision on remand, lends support to the conclusion reached in *Grumman*. In *Genentech*, Genentech sued Eli Lilly and the University of California in the Southern District of Indiana, seeking a declaration of non-infringement and invalidity with respect to a patent owned by the university. *Id.* at 935. In addition, Genentech asserted antitrust claims and various state law tort claims. The next day, the University and Eli Lilly brought patent infringement claims against Genentech in the Northern District of California. *Id.* The university then brought a motion to dismiss in the Southern District of Indiana based, in part, on the assertion that the declaratory judgment action was barred as to the university by Eleventh Amendment immunity. *Id.* The court agreed and dismissed the action. *Id.*

On appeal, the Federal Circuit addressed the question of whether the university was entitled to Eleventh Amendment immunity as to the antitrust and state law tort claims. *Id.* at 944. The Federal Circuit held that, by asserting patent infringement claims against Genentech, the university had waived its Eleventh Amendment immunity as to Genentech's defenses and, for the purposes of recoupment, as to all compulsory counterclaims. *Id.* at 947. The Federal Circuit remanded to the district court to determine whether or not Genentech's claims constituted compulsory counterclaims. *Id.*

On remand, the district court addressed whether two of the claims were compulsory. *In re Recombinant DNA Tech. Patent and Contract Litig.*, 874 F.Supp. 904 (S.D.Ind.1994). First, the district court addressed whether a third party beneficiary claim was a compulsory counterclaim. *Id.* at 920. This claim was based on Genentech's allegation that it was a third-party beneficiary of an Institutional Patent Agreement ("IPA") between the university and the Department of Health, Education and Welfare ("HEW"), which had provided funding for research related to the patent at issue. *Id.* at 907. Under the IPA, the university was obligated to "license any patents arising from the work funded by the HEW on a non-exclusive basis and subject only to a reasonable royalty." *Id.* Genentech alleged that it was harmed when the university and Eli Lilly applied for, and ultimately received, a waiver of the licensing restrictions under the IPA, which then allowed the university to grant Eli Lilly an exclusive license to the patent at issue. *Id.* at 908. The court explained, "[a]pparently, Genentech's argument is that had the nonexclusive licensing provisions remained unaltered, Genentech would have had a right to obtain a license to the '877 patent-a right that would have precluded UC from alleging Genentech infringed the '877." *Id.* at 920.

The court held that the third party beneficiary claim was a compulsory counterclaim. *Id.* It explained its holding as follows:

> Genentech apparently uses its third-party beneficiary claim both *offensively and defensively*. Offensively, Genentech seeks to hold UC liable for its actions vis-a-vis the 1980 IPA between UC and the HEW and vis-a-vis the 1978 option agreement between Lilly and UC. Such claim would require this Court to consider the language of these agreements and the obligations the agreements placed on

---

determining whether or not a counterclaim is compulsory. Rather, the court in *In re Lazar* envisioned that the usual test for determining whether a counterclaim arises out of the same transaction or occurrence should be applied in cases involving Eleventh Amendment immunity.

UC and Lilly. Defensively, Genentech asserts that the aforementioned agreements gave Genentech a right to a license to the '877 patent, and that this right should have precluded UC ever from lodging a patent infringement suit against it based on the '877 patent. *Since Genentech's defensive use of the third-party beneficiary claim will require an analysis of the same facts and law that offensive use of that claim would, we believe Genentech's third-party beneficiary claim properly is classified as compulsory.* To hold otherwise would mandate review of the same facts and the same law by a different tribunal at a later date. Such a holding would counter Rule 13(a)'s purpose of furthering judicial economy.

*Id.* (emphasis added).

The district court also addressed whether or not a claim for breach of a settlement agreement between the university and Genentech was a compulsory counterclaim. *Id.* at 922. According to Genentech, the settlement agreement contained a provision that authorized Genentech to use the materials that were at the heart of the patent dispute. *Id.* Therefore, Genentech argued, the settlement agreement provision was also a defense to the university's patent infringement claim. *Id.* The district court rejected Genentech's argument, but in doing so, it did not question Genentech's assumption that the claim would be a compulsory counterclaim if it was based on the same facts as one of its defenses. Rather, the district court observed that there was nothing in Genentech's complaint that provided any suggestion that Genentech was asserting a defense based on prior authorization to use the material at issue. *Id.*

The district court in *Genentech* clearly held that the "transaction or occurrence" included the subject of the affirmative defenses, and this Court agrees. The Court concludes that counterclaims should be considered compulsory when they are based on the same "transaction or occurrence" as the plaintiff's causes of action *and* the affirmative defenses asserted in the action.

b. *Are Fujitsu's Counterclaims Logically Related to Its Affirmative Defenses?*

■ Fujitsu asserts that its counterclaims are based on the same facts as its affirmative defenses and points to evidence it says it will rely on in support of both its affirmative defenses and its counterclaims. UI, on the other hand, asserts that Fujitsu has failed to demonstrate that its counterclaims arise out of the same transaction or occurrence as its affirmative defenses. First, UI questions whether this issue can be resolved based on Fujitsu's assertions concerning the evidence it will rely on in the future. Second, UI challenges whether or not the facts on which Fujitsu relies in its counterclaims can, as a matter of law, provide a basis for its affirmative defenses.

■ The Court concludes that Fujitsu's counterclaims are based on the same underlying factual *allegations* as are its affirmative defenses. In particular, the factual allegations supporting Fujitsu's affirmative defense of unclean hands encompasses all of the conduct alleged in support of Counterclaims Six through Thirteen. Therefore, the Court holds that UI has waived its Eleventh Amendment immunity as to Counterclaims Six through Thirteen.[15]

---

**15.** In this Order, the Court does not reach the question of whether damages on Fujitsu's counterclaims against UI are limited to recoupment. The Court is also mindful that at this stage of the proceedings, it is impossible to know whether or not Fujitsu's affirmative defenses will be supported by the evidence. If the Court determines at a later stage of this case that Fujitsu's affirmative defenses are not

### c. Are Abuse of Process Counterclaims Permissive Under Pochiro?

█ UI argues that under *Pochiro*, Fujitsu's counterclaims for abuse of process cannot be compulsory counterclaims. The Court is not persuaded by UI's argument.

In *Pochiro* the court concluded that all of the plaintiffs' claims, including their abuse of process claims, were barred as compulsory counterclaims. 827 F.2d at 1252. The court went on to discuss case law addressing whether or not abuse of process claims are compulsory counterclaims in the action alleged to be abusive. *Id.* at 1252. The court noted that there was a split of authority as to "whether an abuse of process claim is a compulsory counterclaim in the very action which allegedly is abusive." *Id.* The court then rejected the line of cases that refused to find an abuse of process claim a compulsory counterclaim in the same action on the basis that such claims were unrelated to the underlying substantive claims. *Id.* The court noted that those cases were inconsistent with the Supreme Court's instruction that " 'transaction' is a word of flexible meaning which may comprehend a series of occurrences if they have logical connection.' " *Id.* at 1252 (quoting *Moore v. New York Cotton Exch.*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926)).

Although *Pochiro* holds that an abuse of process claim is a compulsory counterclaim in the same action in which process is alleged to have been abused (which suggests, conversely, that such a claim cannot be a compulsory counterclaim in a subsequent action), *Pochiro* does not address a situation in which the process alleged to have been abused is a prior *administrative* proceeding. Where the prior proceeding is administrative, the abuse of process claim may not be recognized and/or the same relief might not be available as in a judicial proceeding. Under such circumstances, courts have held that rulings on claims brought in a prior administrative proceeding do not have preclusive effect, even if the claim before the administrative tribunal was based on the same transaction or occurrence as the claim that was later brought in federal court. *See Bio–Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1563 (Fed.Cir.1996). Thus, in *Bio–Technology General Corp.*, the court declined to give preclusive effect to the ITC's dismissal of an action, even though the district court action was based on the same claim, because the ITC did

supported by the evidence or are otherwise insufficient as a matter of law, it may be necessary to revisit the question of UI's waiver of Eleventh Amendment immunity. The Court declines UI's invitation to hold that some or all of the affirmative defenses (other than the Tenth, addressed below) do not allege facts sufficient to constitute an affirmative defense or contain surplus allegations of fact which do not amount to a defense. UI Reply at 7–11. First, UI's generalized objection on the pleadings to the unclean hands defense lacks merit. *See Precision Instrument Mfg. Co. v. Auto. Maintenance Mach.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (holding that the doctrine of unclean hands "gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant [and] is not bound by formula or restrained by any limitation that tends to trammel. the free and just exercise of discretion"). That defense by itself contains all of the allegations included in the counterclaims. As a result, even if some of the defenses were stricken at this stage of the case, the overlap between the subject of the counterclaims and the subject of the affirmative defenses would still be 100%. Second, UI's attack on the sufficiency of the allegations in the affirmative defenses (other than the Tenth) comes not in the opening brief on a motion to strike, but in a *reply* brief on a motion to dismiss the *counterclaims*. It is improper to raise in reply a series of arguments that amount to an entirely new, unfiled motion.

not have the power to award damages. *Id.* Here, as in *Bio–Technology General Corp.,* the relief that UI and Competitive could have obtained in the ITC proceeding—in contrast to the relief available in this action—did not include damages. Therefore, under the reasoning of *Bio–Technology General Corp.,* Fujitsu's abuse of process counterclaims could not have been compulsory counterclaims in that action and are not barred in this action.[16]

### B. *Subject Matter Jurisdiction*

Both Competitive and UI assert that the Court does not have subject matter jurisdiction over Fujitsu's Sixth through Thirteenth Counterclaims. First, both argue that there is no diversity jurisdiction as to these claims. Second, both argue that the counterclaims do not arise out of the same case or controversy as do UI's infringement causes of action and therefore, that there is no supplemental jurisdiction over Fujitsu's Sixth through Thirteenth Counterclaims. Finally, both argue that even if there is supplemental jurisdiction, the Court should exercise its discretion to decline to hear Fujitsu's counterclaims. For the reasons stated below, the Court concludes that there is diversity jurisdiction over Fujitsu's Sixth through Thirteenth Counterclaims against Competitive and supplemental jurisdiction over these counterclaims against UI.

### 1. Diversity Jurisdiction

#### a. *UI*

■ UI asserts that there can be no diversity jurisdiction over it because it is an arm of the state and a state is not a citizen for purposes of diversity. *See Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973)

(noting that "[t]here is no question that a State is not a 'citizen' for the purposes of diversity jurisdiction"); *see also Univ. of South Ala. v. American Tobacco Co.,* 168 F.3d 405, 411 (11th Cir.1999) (holding that state university was not a citizen for purposes of diversity jurisdiction and noting that analysis for determining whether entity is a citizen for purposes of diversity jurisdiction is the same as analysis for determining whether entity is entitled to Eleventh Amendment immunity). Fujitsu raises essentially the same arguments on this issue as it does with respect to the Eleventh Amendment immunity analysis. For the reasons stated above, the Court finds that UI is an arm of the state of Illinois and that there is no diversity jurisdiction over Fujitsu's Sixth through Thirteenth Counterclaims against UI.

#### b. *Competitive*

■ In its Reply, Competitive concedes that the requirements for diversity jurisdiction are met as to Counterclaims Six through Thirteen against Competitive. Competitive suggests, however, that the court does not have personal jurisdiction over Competitive. Reply at 2–3.

■ The Court rejects Competitive's assertion that this Court lacks personal jurisdiction over it. Competitive has provided no authority in support of this argument and has not explained why it has never, in the year since this case was transferred to the Northern District of California, brought a motion to dismiss for lack of personal jurisdiction. Competitive filed this action, and has therefore waived any objection to personal jurisdiction with respect to compulsory counterclaims. *See*

---

**16.** As discussed below, however, while this distinction undercuts UI's argument that the abuse of process counterclaims are permissive rather than compulsory, the fact that

Fujitsu's counterclaims are based on a prior administrative proceeding also makes these counterclaims defective under Rule 12(b)(6).

*Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974) (holding that where there is jurisdiction as to claim, no independent basis for federal jurisdiction required for compulsory counterclaim). The fact that this action was transferred from Illinois does not change this result. *See Grupke v. Linda Lori Sportswear, Inc.,* 174 F.R.D. 15, 18 (E.D.N.Y.1997) (rejecting plaintiffs' assertion that court did not have personal jurisdiction with respect to compulsory counterclaims asserted against them, even though action had been transferred on defendants' motion, on the basis that plaintiffs had continued to litigate their claims in transferee forum rather than dismissing claims to avoid trying them in transferee court); *Star–Brite Distributing, Inc. v. Gavin,* 746 F.Supp. 633 (N.D.Miss.1990) (same). Following transfer, Competitive continued to prosecute this action in this Court, and has appeared before this Court on numerous occasions without ever asserting a lack of personal jurisdiction. Indeed, Competitive moved to dismiss the counterclaims at issue and did not raise personal jurisdiction until its Reply brief. Competitive has waived any objection to personal jurisdiction. The Court finds that it has subject matter jurisdiction over Fujitsu's Sixth through Thirteenth Counterclaims against Competitive on the basis of diversity.[17]

### 2. Supplemental Jurisdiction

#### a. *Do the Counterclaims Arise out of the Same Transaction or Occurrence?*

Because there is no diversity jurisdiction with respect to Fujitsu's Counterclaims Six through Thirteen against UI, the Court must address UI's argument that there also is no supplemental jurisdiction over these counterclaims. Pursuant to 28 U.S.C. § 1367(a), in an action in which the district court possesses original jurisdiction over a federal claim, the district court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Although some courts have suggested that the "case or controversy" test is broader than the "logical relationship test" that is applied to compulsory counterclaims, *see, e.g., Rothman v. Emory Univ.,* 123 F.3d 446, 454 (7th Cir.1997), some have held that supplemental jurisdiction exists only as to compulsory counterclaims and not as to permissive counterclaims. *See, e.g., Hart v. Clayton–Parker and Assoc., Inc.,* 869 F.Supp. 774, 776 (D.Ariz.1994). The Court need not resolve this issue, however, because it finds that Counterclaims Six through Thirteen are compulsory counterclaims, as discussed above. Accordingly, these counterclaims are part of the same

**17.** Competitive also asserts that venue is improper as to these counterclaims. Competitive's argument is to no avail. It is well established that where venue is proper for the plaintiff's original claims and additional claims are asserted as counterclaims or cross-claims, a venue objection is unavailable. *See Bredberg v. Long,* 778 F.2d 1285, 1288 (8th Cir.1985) (recognizing rule); *Shapo v. Engle,* 2000 WL 198435 (N.D.Ill.) (holding that intervenor was not required to satisfy venue requirements where venue was proper as to the plaintiff's claims); *see also* Wright, Miller & Cooper, Federal Practice and Procedure, Juris 2d. § 3808. Because the district court in Illinois already determined that venue was proper in this Court with respect to UI and Competitive's patent infringement claims, Competitive may not now object to venue as to Fujitsu's compulsory counterclaims. *See Grupke,* 174 F.R.D. at 18 (holding that plaintiffs in transferred action could not object to venue in transferee forum where transferor court had determined that venue was proper in transferee forum as to plaintiffs' claims).

case or controversy as UI's claims, regardless of which test is applied. Therefore, the Court may exercise supplemental jurisdiction over Counterclaims Six through Thirteen against UI.

### b. *Should the Court Decline to Exercise Supplemental Jurisdiction?*

■■■ UI and Competitive assert that the Court should decline to exercise supplemental jurisdiction over Counterclaims Six through Thirteen under 28 U.S.C. § 1367(c). Section 1367(c) provides as follows:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). UI asserts that the Court should not exercise supplemental jurisdiction because Counterclaims Six through Thirteen will substantially predominate over the patent infringement claims.[18] The Court disagrees. Given that Fujitsu's counterclaims are based on the same facts as are the defenses it will present in this action, the Court finds that Fujitsu's counterclaims will not so substantially predominate as to justify the judicial inefficiency that would result if this Court were to decline to exercise supplemental jurisdiction.

### C. *Sufficiency of Fujitsu's Allegations Under Rule 12(b)(6)*

UI and Competitive assert that even if this Court has jurisdiction over Fujitsu's Sixth through Thirteenth Counterclaims, all of those counterclaims should be dismissed for failure to state a claim under Rule 12(b)(6). Below, the Court addresses the sufficiency of each of these counterclaims.[19]

### 1. Counterclaim Six (Breach of Confidentiality)

Fujitsu alleges in Counterclaim Six that its discussions with Competitive regarding licensing "were based on the understanding that the existence, status and substance of the discussions would remain in confidence." Answer to Amended Complaint at ¶ 80. Fujitsu further alleges that "CTI, acting with and for UI, repeatedly indicated by its conduct that it knew that the existence, status, and substance of its business discussions with Fujitsu were confidential and could not be disclosed without Fujitsu's permission." *Id.* at ¶ 81. In support of this allegation, Fujitsu cites to [ ] *Id.* at ¶ 82. Fujitsu also cites to a provision in a draft license agreement sent

---

**18.** Competitive also argues that supplemental jurisdiction should not be exercised due to "exceptional circumstances" and because Fujitsu's counterclaims raise "complex issue[s] of state law." Because the Court concludes that subject matter jurisdiction over Counterclaims Six through Thirteen against Competitive is based on diversity, it need not reach these issues, which were not raised by UI. Even if the Court were to reach Competitive's arguments, however, the Court would reject them. None of the arguments raised by Competitive for declining to exercise supplemental jurisdiction provides a sufficient basis for reaching such a result.

**19.** The Court does not determine at this stage of the case which state's laws will apply to Fujitsu's counterclaims, as such a determination would be premature. However, where no actual conflict has been demonstrated between the laws of the various states whose laws might be applied, the Court relies on California law.

to Fujitsu by Competitive which included an anonymity provision. *Id.* at ¶ 83. That provision prohibited Competitive "from disclosing even the existence of the license without the prior written consent of Fujitsu." *Id.* at ¶ 83. Finally, Fujitsu alleges that its expectation that the negotiations would be kept confidential was based on a "custom and practice of patent licensing negotiations" that such negotiations be treated as "highly confidential." *Id.*

Next, Fujitsu alleges that "Counterdefendant CTI, acting with and for UI, with the assistance of others wilfully and repeatedly breached a duty to maintain the existence, status, and/or substance of the business discussions in confidence owed to Counterclaimants. [ ] *Id.* at 86. [ ] *Id.* at ¶¶ 87, 90.

UI and Competitive assert that, whether Counterclaim Six is construed as a tort claim for breach of confidence or a contract claim for breach of implied contract, Fujitsu has failed to state a claim.

### a. *Breach of Confidence*

▇▇▇ Under California law, a plaintiff may bring an action in tort for breach of confidence.[20] *Entm't Research Group v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1226 (9th Cir.1997). The court in *Entertainment Research* explained the claim as follows: "this cause of action recognizes an obligation in law where in fact the parties made no promise. It is not based upon apparent intentions of the involved parties; it is an obligation created by law for reasons of justice." *Id.* In order to prevail on such a claim, a plaintiff

is required to establish the following elements:

(1) the plaintiff conveyed "confidential and novel information" to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a disclosure or use in violation of the understanding. *Id.*

[17] UI and Competitive assert that Fujitsu fails to state a claim for breach of confidence because: 1) the information allegedly revealed was not confidential and novel; 2) UI could not be liable for breach of confidence because it is not alleged that UI had a personal relationship with Fujitsu and UI did not authorize the allegedly tortious act; and 3) Fujitsu has not alleged that it was damaged. None of the authority offered by UI and Competitive support the conclusion that dismissal of this claim, assuming it is construed as a breach of confidence claim, is warranted under Rule 12(b)(6).

First, UI and Competitive have presented no authority in support of their assertion that the existence of business discussions cannot constitute confidential and novel information for the purposes of the tort of breach of confidence. Nor does the Court find any such authority.

▇▇▇ Second, Fujitsu has alleged sufficient facts to state a claim based on a theory of vicarious liability as to UI. It is well established that a principal may be

---

20. UI represents that there is no claim for breach of confidence in any of the other states whose laws might apply besides California. Fujitsu does not dispute this point. Fujitsu also does not appear to dispute Competitive's assertions that Counterclaim Six does not state a claim for breach of fiduciary duty. Rather, Fujitsu argues that it has stated a claim in Counterclaim Six for breach of confidence under California law and a claim for breach of implied contract under the laws of several other states whose laws might apply to this claim (including California). The Court agrees. Therefore, the court need not now resolve the choice of law issue as to this claim.

liable for the tortious conduct of an agent, even if the principal has not authorized the conduct. *See* Restatement (Second) of Agency, § 216 (1958). Section 216 provides as follows:

A master or other principal may be liable to another whose interests have been invaded by the tortious conduct of a servant or other agent, although the principal does not personally violate a duty to such other or authorize the conduct of the agent causing the invasion.

Restatement (Second) of Agency § 216. The comment to Section 216 explains further:

A principal is often subject to liability for the unauthorized conduct of an agent with respect to matters which, under the agreement creating the relation, he has the right to direct. The range of conduct for which there may be liability is greater in the case of servants than in the case of agents who are not servants but, as to both classes, liability is normally based upon the fact that the tort is brought about in the course of an undertaking for the benefit, and subject to the right, of the principal to control his servant or other agent.

*Id.*, comment a.

The cases relied on by UI do not support a contrary result. In particular, UI asserts that *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 656 A.2d 1009 (1995) and *A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 579 A.2d 69, 74 (1990) stand for the proposition that a principal may be liable for the tortious acts of its agents only if the tortious conduct was authorized or ratified by the principal. UI misstates the holding of both cases. In *Larsen*, the court addressed a motion to set aside judgment involving both a claim against a principal based on respondeat superior and a claim in which the plaintiff sought to hold the principal directly liable.

The court explained the difference between the two claims as follows:

In the twelfth count of its complaint, the plaintiff alleged that Pearce Company, independent of any vicarious liability, had itself committed the business related torts of interference with contractual relations and unfair competition.... This liability arises apart from, and is distinguishable from, liability under the theory of respondeat superior.... As we indicated previously, *the theory of respondeat superior attaches liability to a principal merely because the agent committed a tort while acting within the scope of his employment.* "It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." W. Prosser & W. Keeton, Torts (5th Ed.1984) § 70, p. 502. A principal may be directly liable, however, for the acts of its agents that it authorizes or ratifies. Id., ¶ 501–502; 1 Restatement (Second), supra, § 212 (principal liable for authorized conduct) and § 218 (principal liable for ratified conduct).

*Id.*, 656 A.2d at 1023(emphasis supplied). *Larsen* establishes that authorization or ratification is *not* necessary for respondeat superior liability.

Similarly, UI has quoted language from *A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d at 74, out of context. UI states that this case, like *Larsen*, stands for the proposition that a principal may only be liable if it authorizes or ratifies the tortious conduct of its agent. The most cursory reading of this case reveals that it does not stand for that proposition. In *A–G Foods*, the defendant challenged the trial court's entry of judgment notwithstanding verdict.

*Id.* at 73. The trial court found the defendant liable for the fraudulent acts of its agent and the Connecticut Supreme Court reversed. *Id.* The court began its discussion by noting, "[w]e have long adhered to the principal that in order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in further of the employer's business." *Id.* The court went on to conclude that the evidence did not support the conclusion that the agent was acting within the scope of his employment and in furtherance of the principal's business. *Id.* at 74. While the court notes that there is no evidence that the principal knew about the agent's actions, the court does not hold anywhere that the principal's knowledge was *required* to establish liability. *Id.* Rather, the court was simply addressing the principal's knowledge as a possible alternative basis for liability.

Third, UI asserts that Fujitsu has not adequately alleged damage. As noted above, Fujitsu alleges that [ ] Based on this allegation, the Court cannot say "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (articulating standard for Rule 12(b)(6) motions). Therefore, the Court rejects UI's assertion that Fujitsu's allegations are deficient with respect to damages.

### b. *Breach of Implied Contract*

 Even if the Court ultimately determines that California law does not apply, Counterclaim Six may survive Rule 12(b)(6) scrutiny if it is construed as a claim for breach of implied contract, a claim which is well-established under the laws of many states, including California. "An implied-in-fact contract is 'founded on a meeting of the minds, which ... is inferred, as a fact, from conduct of the parties showing in light of the surrounding circumstances, their tacit understanding.'" *Moreno v. Los Angeles Child Care & Dev. Council,* 963 F.Supp. 876, 879 (C.D.Cal. 1997) (quoting *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). UI and Competitive assert that Fujitsu has failed to state a claim for breach of implied contract. The Court disagrees.

UI argues that Fujitsu fails to allege an implied-in-fact contract because it has only alleged conduct by Competitive and not by Fujitsu showing a meeting of the minds. UI presents no authority, however, suggesting that a claim should be dismissed at the Rule 12 stage where the alleged conduct showing a meeting of the minds was by only one of the parties. Further, the conduct alleged is sufficient to support an inference that there was a meeting of the minds between Fujitsu and Competitive. In particular, Fujitsu alleges that it conducted business discussions based on the understanding that the "existence, status and substance of those discussions" would remain in confidence. Answer to Amended Complaint at ¶ 80. Fujitsu further alleges that this expectation was based on a "custom and practice of patent licensing negotiations" that such negotiations be treated as "highly confidential." *Id.* at ¶ 83. These allegations are sufficient to support a reasonable inference that there was an understanding between Fujitsu and Competitive that their negotiations would be kept confidential.

UI also asserts that Fujitsu has not stated a claim for breach of implied-in-fact contract because it has not alleged that any damages were caused by Competitive's conduct. Reply at 18. As discussed above, Fujitsu's allegations regarding damages are sufficient to satisfy the requirements of Rule 12(b)(6). Therefore, the Court concludes that Fujitsu has al-

leged facts sufficient to state a claim for both breach of confidence and breach of implied contract.

### 2. Counterclaim Seven (Misappropriation of Trade Secrets)

 UI and Competitive assert that Fujitsu fails to state a claim for trade secret misappropriation because: 1) Fujitsu has failed to allege the existence of a "trade secret"; 2) as to UI, Fujitsu has alleged neither that the University knew the information alleged to be a trade secret was confidential nor disclosed it; 3) Fujitsu has not adequately alleged damage. These arguments have no merit.

In its Seventh Counterclaim, Fujitsu alleges that "information concerning the existence, status, and/or substance of the confidential business discussions between Fujitsu and CTI, acting with and for UI, and CTI's agents and affiliates constitutes protectable trade secrets." Answer to Amended Complaint at ¶ 93. Fujitsu alleges that it "took precautions to maintain the confidentiality of the information concerning the existence, status and substance of the business discussions." *Id.* at ¶ 94. Fujitsu further alleges that "CTI, acting with and for UI, misappropriated Fujitsu's trade secrets by wilfully and repeatedly disclosing to others, including competitors of Fujitsu who knew of CTI's breach of confidence, information concerning the existence, status, and substance of the confidential business discussions." *Id.* at ¶ 95. Finally, Fujitsu alleges that it "suffered injury as a result of the misappropriation in the form of competitive damage and other damages to its business and business interests." *Id.* at ¶ 96. These allegations are sufficient to state a claim for misappropriation of trade secrets.

 First, UI and Competitive's assertion that the existence of licensing negotiations cannot, as a matter of law, constitute a trade secret, is not supported by any authority. Under California law, a trade secret is defined as follows:

(d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ.Code § 3426.1(d). There is nothing in the language of the definition that precludes information about the existence of negotiations from constituting a trade secret.

Nor do the cases cited by UI support such a conclusion. For example, in *Knudsen Corp. v. Ever–Fresh Foods, Inc.*, 336 F.Supp. 241, 244 (C.D.Cal.1971), the court did not hold generally that information regarding pricing, marketing and sales strategy of a company could not constitute a trade secret, as UI implies in a parenthetical. Rather, it held under the particular facts of that case, that this information had been made public and therefore could not constitute trade secrets. *Id.* In fact, the implication of *Knudsen* is that if the information had not been publicly available, it could have constituted a trade secret. As the *Knudsen* court notes, "that which constitutes a trade secret must be determined from the facts of each case." *Id.*

Next, UI asserts that it cannot be held liable for misappropriation of trade secret because Fujitsu does not allege that UI knew the negotiations constituted a trade secret or that UI revealed the existence of the licensing negotiations to anyone. Fujitsu replies that the principal can be liable for misappropriation of trade secrets by its agent, citing to a single case, *Bancroft–*

*Whitney Co. v. Glen,* 64 Cal.2d 327, 353, 49 Cal.Rptr. 825, 411 P.2d 921 (1966). Fujitsu however, concedes in its parenthetical that the principal in that case ratified the agent's misconduct. Fujitsu has not cited to any authority establishing that a principal may be held liable for misappropriation of trade secrets even where it is unaware that information constitutes a trade secret and does not itself disclose the trade secret. However, the Court finds that Fujitsu has, nonetheless, stated a claim for misappropriation of trade secrets as to UI by alleging that Competitive was "acting with and for UI." In particular, this allegation may be reasonably construed as an allegation that UI ratified or approved Competitive's conduct.

With respect to damages, Fujitsu has alleged that it suffered "competitive injury" as a result of Competitive's and UI's conduct. Again, the Court cannot say without a doubt that there is no set of underlying facts that could establish that Fujitsu has suffered such injury. *See Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99. Therefore, the Court concludes that Fujitsu's counterclaim for misappropriation of trade secrets is adequately alleged.

### 3. Counterclaim Eight (Fraud)

■ UI and Competitive argue that Fujitsu fails to state a claim for fraud because: 1) Fujitsu fails to allege any participation by the University in the alleged fraud; 2) Fujitsu fails to allege specifically who made the statements at issue; 3) Fujitsu fails to allege facts showing a duty to disclose [ ] 4) Fujitsu's allegation on information and belief that the statements were made with intent to deceive do not meet the specificity requirements of Fed. R.Civ.P. 9(b); 5) Fujitsu does not allege justifiable reliance with specificity; and 6) Fujitsu does not allege any damage that was proximately caused by Competitive's alleged misrepresentation. The Court rejects all of these arguments.

Fujitsu alleges that in a meeting on December 27, 1999, between Fujitsu and "Mr. Fumiya Konishi of Innovation Partners International, Inc., CTI's agent and affiliate in Japan," Mr. Konishi "fraudulently misrepresented that all proceeds from licensing the '349 patent and the '400 patent would go to UI and CTI." Answer to Amended Complaint at ¶ 98. Fujitsu further alleges that [ ] *Id.* at ¶ 99. Fujitsu alleges that [ ] *Id.* Fujitsu alleges these acts and omissions were made by Competitive, "acting with and for UI." *Id.* at ¶¶ 98– 99. Fujitsu further alleges, on information and belief, that these misrepresentations were false and misleading or were made with reckless indifference to the truth, and that the statements were made with the intent to deceive Fujitsu and to induce it to enter into a license with Competitive for the '349 and '400 Patents. *Id.* at ¶ 100. Fujitsu alleges that it justifiably relied on these statements when it entered into a comprehensive cross-license with Matsushita. *Id.* Fujitsu alleges that [ ] *Id.* at ¶ 101. These allegations are sufficient to state a claim for fraud.

■ "The elements of fraud or deceit (*see* Cal. Civ.Code, §§ 1709, 1710) are: a representation, usually of fact, which is false, knowledge of its falsity, intent to defraud, justifiable reliance upon the misrepresentation, and damage resulting from that justifiable reliance." *Stansfield v. Starkey,* 220 Cal.App.3d 59, 72, 269 Cal. Rptr. 337 (1990). Further, Fed.R.Civ.P. 9(b) provides as follows:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b).

■ UI argues that it cannot be liable for fraud because there is no allegation

that it participated in any way in the alleged fraud. This argument fails, however, because UI may be held liable on the basis that Competitive was acting as its agent in the licensing negotiations with Fujitsu. *See Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 471 (7th Cir.1999) (noting in dicta that "[w]hen an agent who is authorized to make a contract on his principal's behalf (and the principal needn't be the agent's employer ...) uses fraud to induce the contract, the principal is liable even if the agent is acting solely to feather his own nest," and that under such circumstances, there is no need to allege a misrepresentation by the principal) (citing to *Gleason v. Seaboard Air Line Ry.*, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929)).

The second argument, that it is not clear who made the allegedly false statements, fails as well. It is clear from Fujitsu's allegations that the alleged misrepresentations were made by Fumiya Konishi.

The third argument, regarding the lack of allegations showing a duty to disclose, is correct. Fujitsu essentially concedes this point. *See* Opposition at 32. However, as Fujitsu points out, the claim also includes affirmative misrepresentations, and it is undisputed that Competitive had a duty not to make affirmative misrepresentations to Fujitsu.

█ The fourth argument, that the fraud allegations are defective because intent is alleged on information and belief, has no merit. As Fujitsu points out, Rule 9(b) provides that intent may be averred generally. Rather, it is the "circumstances" constituting the fraud that must be alleged with specificity. Both of the cases relied on by UI involve the circumstances—that is, the time, place and nature—of the alleged acts, rather than the

intent requirement. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989); *California ex rel. Mueller v. Walgreen Corp.*, 175 F.R.D. 631, 635 (N.D.Cal.1997).

The fifth argument, that Fujitsu has not adequately alleged justifiable reliance, has no merit. Fujitsu alleges specific facts in support of its allegation that it justifiably relied on the alleged misrepresentations. In particular, Fujitsu alleges that [ ]

█ The sixth argument raised by UI and Competitive is that Fujitsu fails to allege that the misrepresentations alleged actually caused the damage that resulted. This argument is not entirely unpersuasive. Fujitsu's theory of causation is tenuous, at best. However, as discussed below, the Court is unable to conclude at this stage of the proceeding that there is no set of facts that could establish causation under Fujitsu's allegations. Rather, the Court defers evaluation of Fujitsu's causation theory until the summary judgment phase of the case.

In order to state a claim for fraud, "the plaintiff must plead and prove the 'detriment proximately caused' by the defendant's tortious conduct." *Service by Medallion, Inc. v. Clorox*, 44 Cal.App.4th 1807, 1818, 52 Cal.Rptr.2d 650 (1996) (quoting Cal. Civ.Code, § 3333). The court in *Service by Medallion* explained:

> Deception without resulting loss is not actionable fraud.... "Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 680, p. 131.)

*Id.* (citations omitted).

In support of its argument that Fujitsu has not adequately alleged causation, UI cites to *In re Wash. Trust Deed Service Corp.*, 224 B.R. 109 (9th Cir. BAP 1998). In *Washington Trust*, a trustee in bank-

ruptcy brought a fraudulent conveyance action in bankruptcy court against a transferee to avoid the conveyance. *Id.* at 111. Subsequently, the trustee and the transferee entered into a settlement agreement that was contingent on approval by the bankruptcy court. *Id.* A hearing was scheduled to obtain approval of the settlement, but before the hearing was held, the trustee decided the settlement was not in the best interest of the estate and took the hearing off calendar. *Id.* The transferee brought a motion to compel the court to place the motion back on calendar, which the court denied. *Id.* The court explained that it was a "foregone conclusion" that it would not approve the settlement agreement in light of the fact that the trustee no longer recommended approval. *Id.*

The transferee then brought a state court action claiming that the trustee had fraudulently misrepresented his intent to support the settlement agreement. *Id.* The trustee removed the state court action to the bankruptcy court, which dismissed the claim. The bankruptcy court explained its holding as follows:

> Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages. And the damages suffered must be referable to, and caused by, the fraud. . . . In fraud, the pleading must show a cause and effect relationship between the fraud and damages sought; otherwise no cause of action is stated. Ultimately, it is lack of court approval, rather than the absence of [the trustee's] support, which caused [the transferee's] damages. Having not alleged that, but for the trustee's change of position, the bankruptcy court would have approved the settlement, his complaint does not state a cause of action under California law.

*Id.* at 113–114 (quotations and citations omitted).

UI asserts that the allegations supporting Fujitsu's fraud counterclaim are even more convoluted than the allegations in *Washington Trust* and that like the plaintiff in that case, Fujitsu has failed to allege facts showing a cause and effect relationship between the fraud and the damages sought. The Court disagrees. Implicit in Fujitsu's allegations is an allegation that, but for the alleged misrepresentations by Competitive, Fujitsu would have been in a position to—and would have—obtained a license from Competitive for the '399 and '400 Patents. Had it obtained those licenses, Fujitsu would have been spared the expense of defending against the patent infringement claims asserted in this action and in the ITC proceeding. The Court cannot say at this stage of the proceeding that Fujitsu will be unable to prove its theory of causation. Rather, this is a question that may only be resolved at a later stage of the case, when the factual record has been developed. Therefore, the Court declines to dismiss Counterclaim Eight under Rule 12(b)(6).

### 4. Counterclaim Nine (Negligent Misrepresentation)

The arguments raised with respect to negligent misrepresentation are essentially the same as those raised as to the fraud claim. As discussed above, the Court finds that Fujitsu's allegations are sufficient to state a claim. Therefore, the Court declines to dismiss this claim under Rule 12(b)(6).

### 5. Counterclaims Ten and Eleven (Unfair Competition)

Fujitsu alleges in its Tenth and Eleventh Counterclaims that UI and Competitive have engaged in unfair competition by initiating a "baseless" action in the ITC in order to commence a "sham investigation," by providing false information in that proceeding and by publicizing the proceeding.

Amended Answer at ¶¶ 109–110, 113–114. Fujitsu further asserts that Competitive's alleged breach of confidence and negligent and fraudulent misrepresentations constituted unfair business practices. UI and Competitive assert that Fujitsu fails to state unfair competition claims on the following grounds: 1) There is no authority in California or Illinois which permits such an action based on filing of a baseless ITC proceeding and Connecticut law prohibits such an action; 2) although breach of confidence and trade secret misappropriation may provide a basis for unfair competition claims, Fujitsu's allegations are not sufficient to state such claims; 3) the alleged actions in the ITC are privileged under the *Noerr–Pennington* doctrine; and 4) the alleged actions in the ITC are privileged under state law. The Court rejects all of these arguments.

a. *Can an ITC Action Provide a Basis for an Unfair Competition Claim Under Law of California, Illinois or Connecticut?*

 UI and Competitive argue that to the extent the unfair competition counterclaims are based on the ITC action, those claims should be dismissed because such claims are not recognized under the laws of California, Illinois, or Connecticut. However, neither UI nor Competitive have identified any cases, under the law of any of these three states, which have explicitly held that an unfair competition claim *may not* be based on an ITC proceeding. Nor

does the language of Conn. Gen.Stat. § 42–110c,[21] cited by UI and Competitive, convince the Court that an unfair competition claim based on an ITC proceeding is prohibited under Connecticut law, at least where, as here, the ITC proceeding is alleged to have been a sham, as discussed below. Rather, the case law makes clear that unfair competition claims may be based on a wide range of conduct. *See Balboa Ins. Co. v. Trans Global Equities*, 218 Cal.App.3d 1327, 1341–1342, 267 Cal. Rptr. 787 (1990). Finally, at least one court that has directly addressed the question has concluded that an unfair competition claim *may* be based on an ITC proceeding. *P.D. Rasspe Sohn GMBh & Co. v. National–Standard Co.*, 1990 U.S. Dist. LEXIS 19646 (S.D.Mich.) (holding that Michigan law would recognize a claim for unfair competition based on initiation of a baseless ITC action for the purpose of restraining and excluding legitimate competition). Given that this Court has not yet made a choice of law, and in the absence of any clear authority holding that such claims are barred under the law of any of the states whose law maybe applied, the Court is not persuaded by this argument.

b. *Unfair Competition Claims Based on Breach of Confidence and Misappropriation of Trade Secrets*

UI and Competitive argue next that the unfair competition counterclaims are defi-

**21.** That section is a provision of Connecticut's Unfair Trade Practices Act which provides as follows:

(a) Nothing in this chapter shall apply to: (1) Transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States; or (2) acts done by the publisher, owner, agent or employee of a newspaper, periodical or radio or television station in the publication or dissemination of an advertisement, where the publisher, owner, agent or employee did not have knowledge of the false, misleading, unfair or deceptive character of the advertisement, and did not have direct financial interest in the sale or distribution of the advertised product or service.

(b) The burden of proving exemption, as provided in this section, from the provisions of this chapter shall be upon the person claiming the exemption.

Conn. Gen.Stat. § 42–110c.

cient because Fujitsu fails to state a claim for breach of confidence or misappropriation of trade secrets. As discussed above, the Court finds that Fujitsu has stated claims for breach of confidence and misappropriation of trade secrets. Therefore, the Court also finds that Fujitsu has stated claims for unfair competition on the basis of these claims.[22]

### c. *Noerr–Pennington Doctrine*

UI and Competitive assert that Fujitsu's unfair competition claims are barred to the extent that they are based on the ITC action, under the *Noerr–Pennington* doctrine. The *Noerr–Pennington* doctrine provides that "[p]rivate efforts to influence governmental bodies or courts, even for anticompetitive purposes, enjoy an exemption from the antitrust laws grounded in the First Amendment right to petition." *Boulware v. Nevada,* 960 F.2d 793, 797 (9th Cir.1992) (citing to *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington,* 381 U.S. 657, 669–71, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137–38, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). This doctrine "sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government." *Kottle v. Northwest Kidney Centers,* 146 F.3d 1056, 1059 (9th Cir.1998).

An exception to the *Noerr–Pennington* doctrine is recognized when the activity at issue is a "sham." *Cal. Motor Transport Co. v. Trucking Unlimited,* 404 U.S. at 511, 92 S.Ct. 609. The Ninth Circuit has described the sham exception:

We have defined as a sham litigation "undertaken solely to interfere with free competition and without the legitimate expectation that such efforts will in fact induce lawful government action." ... As this formulation indicates, courts frequently have approached sham claims by attempting to assess the objective legal merit of the predicate suit. A finding that the predicate action was baseless would thus be sufficient to establish that the primary motivation behind the litigation was to inflict anticompetitive injury through the judicial process because the expected value of the legal outcome of a meritless suit is zero.

*Boulware,* 960 F.2d at 797.

■ At the motion to dismiss stage, the court should apply a heightened pleading standard to determine if the *Noerr–Pennington* doctrine applies because "when a plaintiff seeks damages for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required." *Kottle,* 146 F.3d at 1063 (quotation and citation omitted).

■ Fujitsu does not dispute that the ITC proceeding is the type of activity that would normally fall under the *Noerr–Pennington* doctrine. Rather, Fujitsu argues that its allegations fall under the sham exception to the *Noerr–Pennington* doctrine. Moreover, it asserts that its allegations contain sufficient specific facts to meet the heightened pleading requirement under that doctrine. The Court agrees.

Fujitsu's counterclaims address the ITC proceeding in some detail, alleging not only that the action was baseless, but also alleging specific facts in support of that

---

**22.** UI concedes that common law breach of confidence and misappropriation of trade se-

crets claims *do* provide a basis for unfair competition claims. *See* UI Motion at 31.

allegation. First, Fujitsu alleges that Competitive "falsely asserted to the ITC during the pre-filing phase of the ITC investigation that the licensed 'domestic industry' requirement was met by research activity at UI [ ] even though UI had not performed PDP research "for many years" [ ] Answer to Amended Complaint at ¶ 59. Second, Fujitsu alleges that "CTI and UI deceived the ITC by submitting technical documentation concerning CTI's infringement allegations that purported to accurately reflect the accused PDPs, but which in fact CTI and UI knew was incorrect. *Id.* at ¶ 60. Fujitsu describes the contents of these documents and the reason they were incorrect in detail. *See id.* Finally, Fujitsu alleges that UI and CTI intentionally concealed from the ITC the fact that "foreign counterparts to the patent claims asserted had been revoked by the European Patent Office as invalid based on prior art that was not cited to the United States Patent Office." *Id.* at ¶ 61.

On the basis of these allegations, the Court concludes that Fujitsu has adequately alleged that the ITC action was baseless, thereby satisfying the "sham exception" under *Noerr–Pennington.*

#### d. *State Law Privilege*

 UI asserts that Fujitsu's unfair competition claims are barred by absolute privilege under Cal. Civ.Code §§ 47(b) and (d). Section 47(b) provides that "[a] privileged publication or broadcast is one made ... [i]n any ... judicial proceeding ... [or] in any other official proceeding authorized by law." Section 47(d) makes privileged "a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof." UI asserts further that the same privileges apply under the laws of most other states, including Connecticut and Illinois.

Fujitsu asserts that it is inappropriate to apply California privilege law to a claim in which the relevant conduct did not occur in California. However, Fujitsu does not address the Illinois and Connecticut cases cited by UI suggesting that the same privilege applies under the law of those states. *See Petyan v. Ellis,* 200 Conn. 243, 245–246, 510 A.2d 1337 (1986) (holding that former employer could not be sued for libel and intentional infliction of emotional distress based on statements made in form request by state agency); *Libco Corp. v. Ware Adams,* 100 Ill.App.3d 314, 316, 55 Ill.Dec. 805, 426 N.E.2d 1130 (1981) (barring libel claim based on statements made in course of legal proceeding). Because Fujitsu has not demonstrated a conflict of laws, the merits of UI's argument can be assessed with reference to California law.

Fujitsu argues that even if California privilege law is applicable, the requirements for Cal. Civ.Code § 47(b) are not met here. In particular, Fujitsu asserts that the gravamen of its unfair competition claim is not that Fujitsu's injury resulted from the misrepresentations themselves. Rather, the injury resulted from the prosecution of a baseless action that lacked probable cause. The misrepresentations, Fujitsu argues, are merely evidence that the action was baseless and lacking in probable cause. Neither UI nor Fujitsu is able to cite to any case that is directly on point on this issue. Although a close call, the Court concludes that Fujitsu has the stronger position and that the privilege does not apply.

Although typically the privilege embodied in section 47(b) is applied to claims for libel and defamation, courts have also applied the privilege to other types of claims where the injury at issue was caused by statements made in the course of a judicial or administrative proceeding, such as intentional infliction of emotional distress

and intentional interference with economic advantage. *See White v. Western Title Ins. Co.*, 40 Cal.3d 870, 887, 221 Cal.Rptr. 509, 710 P.2d 309 (1985). The court in *White* noted, however, that in applying the privilege under section 47(b), courts must "draw a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication." *Id.* In *White*, the court held that a plaintiff was not precluded under section 47(b) from offering into evidence settlement offers made in the course of litigation that showed that the defendant insurer had breached its covenant of good faith and fair dealing with respect to its insurance contract with plaintiff. *Id.*

Fujitsu's unfair competition counterclaims, to the extent they are based on the ITC proceeding, allege Fujitsu was injured as a result of having to defend against a baseless action rather than as a result of the alleged misrepresentations before the ITC. Here, as in *White*, the alleged misrepresentations are offered as evidence of the underlying course of conduct rather than as the actual source of the harm. As a result, the Court concludes that the privilege under section 47(b) does not apply. For the same reason, the privilege under section 47(d) does not apply.

Finally, the Court rejects UI's argument, based on *Albertson v. Raboff*, 46 Cal.2d 375, 382, 295 P.2d 405 (1956), that because Fujitsu's claims are not malicious prosecution claims, the privilege under sections 47(b) and (d) must apply. In *Albertson*, the plaintiff brought a malicious prosecution claim and a disparagement of title claim based on a prior action by the defendant in which the defendant had sought money damages and to impose a lien on the plaintiff's property. 46 Cal.2d at 377, 295 P.2d 405. In connection with that action, the defendant had recorded a

notice of lis pendens. *Id.* As to the disparagement of title claim, the court held that it was subject to the privilege in section 47(b), noting that the same privileges that apply to defamation claims also apply to disparagement of title claims. *Id.* at 379, 295 P.2d 405. The court went on to hold that the privilege did not apply to the malicious prosecution claim. *Id.* at 382, 295 P.2d 405. The court explained its result as follows:

> It may be noted at the outset that the fact that a communication may be absolutely privileged for the purposes of a defamation action does not prevent its being an element of an action for malicious prosecution in a proper case. The policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.

*Id.* UI infers from this language that the policy considerations underlying sections 47(b) and (d) are *only* outweighed when the claim asserted requires favorable termination. Fujitsu, on the other hand, points to the similarity between malicious prosecution claims and its counterclaims based on an allegedly baseless ITC proceeding.

*Albertson* simply does not stand for the broad proposition attributed to it by UI. Rather, *Albertson* provides little guidance under the circumstances here because the court in that case did not address whether the rationale that applies to malicious prosecution claims also applies to other claims based on lack of probable cause.

The Court declines to dismiss counterclaims Ten and Eleven.

### 6. Counterclaims Twelve and Thirteen (Abuse of Process)

Fujitsu alleges in Counterclaims Twelve and Thirteen that UI and Competitive "abused the process of the ITC" for improper purposes. Answer to Amended Complaint at ¶¶ 117, 122. In particular, Fujitsu alleges, UI and Competitive used the ITC proceeding to "obtain a quick settlement" and to take advantage of the ITC's "extraordinary powers" to obtain discovery to which it otherwise would not have been entitled. *Id.* at ¶¶ 117, 118, 122, 123.

UI and Competitive argue that Fujitsu's abuse of process claims fail because the state law tort of abuse of process applies only to judicial proceedings. They argue further that there is no claim for abuse of process involving an ITC proceeding under federal law and that such a claim is, in fact, preempted by federal law. Finally, they argue that even if abuse of process claims were available with respect to ITC proceedings, Fujitsu has not alleged any *misuse* of the proceeding and therefore has not stated a claim.

■■■ Fujitsu does not dispute that the tort of abuse of process applies only to judicial proceedings. Nor does Fujitsu present any authority suggesting that there is a federal common law claim for abuse of process in the ITC. Rather, Fujitsu argues that the actions of Competitive and UI before the ITC constituted abuse of the judicial process in the Illinois action. Fujitsu argues further that it has adequately alleged misuse of the judicial process. Fujitsu's arguments are unconvincing.

■■■ In order to prevail on a state law tort claim of abuse of process, a plaintiff must establish that a defendant misused "the machinery of the legal system" for an ulterior motive. *ComputerXpress, Inc. v. Jackson,* 93 Cal.App.4th 993, 1014, 113 Cal. Rptr.2d 625 (2001) (holding that plaintiff

"failed to establish probability of success under California's anti-SLAPP statute on abuse of process claim because plaintiff alleged misuse of administrative process of Federal Communications Commission rather than abuse of judicial process"). The process that is alleged to have been abused must be a judicial process, and courts have rejected claims based on administrative proceedings—even quasi-administrative proceedings. *Id.*

Similarly, the Federal Circuit has held that an abuse of process claim cannot be "invoked as a remedy for inequitable or other unsavory conduct of parties to proceedings in the Patent and Trademark Office." *Abbott Labs. v. Brennan,* 952 F.2d 1346, 1355 (Fed.Cir.1992). The court stated:

> We conclude that the federal administrative process of examining and issuing patents, including proceedings before the PTO's boards, is not subject to collateral review in terms of the common law tort of abuse of process. The PTO procedures themselves provided a remedy for Abbott's malfeasance.... An additional state action would be an inappropriate collateral intrusion on the regulatory procedures of the PTO, "under the guise of a complaint sounding in tort", in the words of *Gilbert v. Ben–Asher,* 900 F.2d [1407] at 1411 [(9th Cir.1990)], and is contrary to Congress' preemptive regulation in the area of patent law.

*Id.* Thus, there appears to be no authority to support the existence of an abuse of process claim based on an ITC proceeding, either under state or federal law.

■■■ Fujitsu tries to get around the requirement that a *judicial* process must have been misused by arguing—outside of the pleadings—that the process that was allegedly misused was, in fact, not the ITC proceeding but the Illinois action.

First, Fujitsu argues that UI and Competitive misused the judicial process in the Illinois action by seeking discovery in the ITC action, with the goal of obtaining an advantage in the Illinois action. There is no authority that holds that an ulterior motive that *relates* to a judicial process is sufficient where the process that is alleged to have been abused is not judicial.

■ Nor is the Court persuaded by Fujitsu's additional argument that a judicial proceeding was abused because the United States District Court for the Central District of Illinois signed an order, dated May 8, 2001, authorizing depositions to be taken in Japan. *See* Exh. O to Declaration of James Oliva in Support of Counterclaimants' Opposition. Fujitsu represented at oral argument that this order, although ostensibly part of the Illinois action, was issued in connection with the ITC proceeding and therefore, that its abuse of process claims involved a judicial proceeding. This argument fails for at least two reasons. First, even if the order was issued in connection with the ITC proceeding rather than as part of discovery in the Illinois action, it is collateral to the ITC proceeding, which remains an administrative proceeding. Second, there is nothing in the record before the Court indicating that the May 8, 2001 order was, in fact, issued as part of the ITC proceeding. In short, regardless of whether the order was or was not issued in connection with the ITC proceeding, it does not save Fujitsu's counterclaims for abuse of process, which are, as alleged, based on abuse of an administrative rather than a judicial proceeding

Counterclaims Twelve and Thirteen are dismissed with prejudice.

### D. *California Anti–SLAPP Law*

UI and Competitive argue that even if the Court rejects its other arguments relating to Counterclaims Ten through Thir-

teen, those claims are subject to California's anti-SLAPP law, Cal.Civ.Proc.Code § 425.16. That law provides as follows:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. § 425.16(b)(1). The law covers:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. § 425.16(e). Fujitsu, however, argues that California's anti-SLAPP law does not apply to its counterclaims at all. The Court agrees.

■ To determine whether or not California privilege law applies to Fujitsu's counterclaims, the Court must engage in a choice of law analysis. In diversity cases, the choice of law rules of the state in which the court sits are applied. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Similarly, in federal question cases where the

court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law rules of the forum state to those state law claims. *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir.1996). In transferred cases, however, the choice of law rules that are applied depend upon the nature of the transfer. In particular, where a case is transferred under 28 U.S.C. § 1406, the choice of law rules of the transferee court—here, California—are applied. *Nelson v. International Paint Co.*, 716 F.2d 640, 643 (9th Cir.1983). On the other hand, where a case is transferred pursuant to 28 U.S.C. § 1404(a), the choice of law rules that would have been applied by the transferor court—here, Illinois—are applied. *Ferens v. John Deere Co.*, 494 U.S. 516, 525, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). The latter rule applies not only to the transferred claims but also to any counterclaims, even if the counterclaims are asserted after the case has been transferred. *See De Puy Inc. v. Biomedical Eng'g Trust*, 216 F.Supp.2d 358, 382 (D.N.J.2001) (holding that where case was transferred under § 1404(a), counterclaims were governed by law of transferor court).

Here, the court in the Illinois action stated that it was transferring the action under § 1404(a), or, in the alternative, under § 1406. *See* Order dated April 2, 2002. Thus, Fujitsu argues that the case was transferred under § 1404(a), while UI and Competitive argue that the case was transferred under § 1406. The Court need not resolve this issue at this stage of the proceeding, however, because the Court concludes that regardless of whether California or Illinois choice of law rules are applied, California privilege law does not apply.

▮ Illinois follows the most significant relationship test for tort claims. *Esser v. McIntyre*, 169 Ill.2d 292, 297, 214

Ill.Dec. 693, 661 N.E.2d 1138 (1996). The court in *Esser* described this test as follows:

> Under this test, the law of the place of injury controls unless [another state] has a more significant relationship with the occurrence and with the parties.... When applying the most significant relationship test, a court should consider (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered. The court must look at the contacts of the jurisdictions under these four factors and then evaluate those contacts in light of the policies underlying the laws of those jurisdictions.

*Id.* Thus, it is presumed that the law of the state where the injury occurred controls unless it is shown that another state has a more significant relationship to the occurrence or the parties. *Id.*

Applying this rule, many courts have held that abuse of process and malicious prosecution claims are governed by the law of the state where the proceeding complained of occurred. *See, e.g., In re American Cont'l Corp./Lincoln Savings & Loan Sec. Litig.*, 845 F.Supp. 1377, 1383 (D.Ariz.1993) (applying Illinois choice of law rules and holding that abuse of process and malicious prosecution claims were governed by Arizona law because proceeding complained of occurred in Arizona); *see also* Restatement (Second) of Conflict of Law § 155 (providing that "[t]he rights and liabilities of the parties for malicious prosecution or abuse of process are determined by the local law of the state where the proceeding complained of occurred, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6...."). Here, the law of the District of Columbia—where the ITC proceeding oc-

curred—should be applied to Counterclaims Ten through Thirteen unless another state has a more significant relationship to the parties or occurrences.

 UI argues, though, that California has a more significant relationship when the approach of *depecage* is used, as is required under Illinois choice of law rules. Under that approach, "the court must identify each issue raised in the case and then determine the controlling law on an issue-by-issue basis." *Global Relief Found. v. New York Times Co.*, 2002 WL 31045394, 2002 U.S. Dist. LEXIS 17081 (N.D. Ill.2002). UI argues that while the counterclaims themselves may be governed by the law of the District of Columbia, any privileges should be based on California law because California has a more significant interest with respect to privilege. UI relies on *Global Relief*.

In *Global Relief*, an Illinois charity filed defamation claims against numerous newspapers, including the San Francisco Chronicle. *Id.*, 2002 WL 31045394 at *3–4, 2002 U.S. Dist. LEXIS 17081 at *11. The Chronicle asserted that the conduct at issue was privileged under California's anti-SLAPP statute. *Id.*, 2002 WL 31045394 at *10, 2002 U.S. Dist. LEXIS 17081 at *30. Applying Illinois choice of law rules, the court held that the defamation claims were governed by Illinois law, because the plaintiff was injured in Illinois. *Id.*, 2002 WL 31045394 at *10, 2002 U.S. Dist. LEXIS 17081 at *32. The court went on to address choice of law with respect to the anti-SLAPP privilege, noting that "the issue of whether a statement is defamatory or invades the right to privacy is distinct from whether that statement is privileged." *Id.* The court held that the anti-SLAPP statute applied on the basis that "California has a great interest in determining how much protection to give California speakers such as the Chronicle." *Id.* The court relied in part on the Restate-

ment (Second) of Conflicts, § 145 comment d, which states that "the local law of the state where the parties are domiciled, rather than the local law of the state of conflict and injury, may be applied to determine whether one party is immune from tort liability to the other." *Id.*

 UI argues that in this case, as in *Global Relief*, California has a significant interest in having its privilege applied because the "the SLAPP—the strategic lawsuit against public policy—is taking place within the borders of California." Reply at 31. This argument is unconvincing. Here, in contrast to the facts in *Global Relief*, the speakers who seek protection under California's anti-SLAPP statute are entities that have little relationship to California and certainly cannot be characterized as "California speakers." Further, to the extent *Global Relief* relies on the comment to the Restatement quoted above, the holding in *Global Relief* points to application of either Illinois law (where UI is domiciled), Delaware law (where Competitive is incorporated), or Connecticut law (where Competitive has its principal place of business). There is no authority suggesting that under Illinois choice of law rules, California would have a more significant interest, or indeed, any interest, in having its law applied to non-California speakers whose actions were taken in a proceeding in the District of Columbia.

Similarly, if California choice of law rules are applied, the anti-SLAPP statute does not apply to Fujitsu's counterclaims. California follows the governmental interest approach to choice of law. *Hurtado v. Superior Court*, 11 Cal.3d 574, 579, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). Under that approach, the court must analyze "the respective interests of the states involved ... the objective of which is 'to determine the law that most appropriately applies to the issue involved.'" *Id.* (quoting *Reich v.*

*Purcell,* 67 Cal.2d 551, 554, 63 Cal.Rptr. 31, 432 P.2d 727 (1967)).[23] In *Hurtado,* the court addressed whether or not a Mexican law limiting damages could be applied to tort claims filed by Mexican citizens against California residents based on an injury that occurred in California. *Id.* at 578, 114 Cal.Rptr. 106, 522 P.2d 666. The court concluded that the Mexican law did not apply because Mexico had no interest in having its law applied under the facts of the case. *Id.* at 580–581, 114 Cal.Rptr. 106, 522 P.2d 666. The court explained its conclusion as follows:

> The interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims.... [T]his interest to avoid the imposition of excessive financial burdens on (defendants) ... is also primarily local; that is, a state by enacting a limitation on damages is seeking to protect its residents from the imposition of these excessive financial burdens.... Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages—Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants.

*Id.* at 581, 114 Cal.Rptr. 106, 522 P.2d 666 (quotations and citations omitted).

Following *Hurtado,* the court in *Block v. First Blood Assoc.,* 691 F.Supp. 685 (S.D.N.Y.1988), reached a similar result. There, the court addressed whether the privilege under Cal. Civ.Code § 47 applied to defamation claims in an action that was filed in California and transferred to New York under § 1404(a), where the allegedly defamatory statements were made in a proceeding in New York. *Id.* at 687. The court applied California choice of law rules. *Id.* at 697. The court concluded that California privilege law did not apply, explaining its result as follows:

> Under the circumstances here, New York, but not California, has an interest in applying its laws to the privilege issue. The fulcrum of a privilege defense is the scope of protection to be afforded under a state's substantive law to otherwise defamatory publications; the purpose of a common law or statutory privilege is the regulation of defamatory conduct that occurs within a state's borders. In this action, New York has a compelling interest in policing tortious conduct committed in New York, by a New York attorney, with reference to future or pending litigation in New York.

*Id.*

Here, as in *Block* and *Hurtado,* California appears to have *no* governmental interest in having its law applied. In particular, neither UI nor Competitive are California residents. Nor did the tortious conduct or injury occur in California. In fact, the only connection with California appears to be Fujitsu's activities in Northern California. Thus, as the court held in *Hurtado,* because it is the plaintiffs rather than the defendants who reside in California, California has no governmental interest in having its privilege applied to Counterclaims Ten through Thirteen.

Because the Court finds the anti-SLAPP statute does not apply, Fujitsu's conditional cross-motion is moot.

---

**23.** Under any choice of law rules, it must first be determined that there is a "true conflict." *See Hurtado,* 11 Cal.3d at 579, 114 Cal.Rptr. 106, 522 P.2d 666. Here, the parties do not dispute that there is such a conflict because California's anti-SLAPP statute provides broader protection than do the laws of any of the states whose law might be applied.

### E. *Fifth Counterclaim, Tenth Affirmative Defense and Aptix*

UI asserts that Fujitsu's Fifth Counterclaim (now pending against UI only) and Tenth Affirmative Defense are barred under the Federal Circuit's decision in *Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369 (Fed.Cir. 2001). In its Fifth Counterclaim. Fujitsu seeks a declaration of unenforceability with respect to both the '349 and '400 Patents. Amended Answer at ¶ 77. In particular, Fujitsu alleges that "[t]he actions, schemes, conduct, and specific intent alleged above constitute patent misuse for which equitable principles require that the patents at issue be declared unenforceable by Counterdefendants against any party." *Id.* In its Tenth Affirmative Defense, for Inequitable Conduct, Fujitsu alleges that "[t]he patents at issue are unenforceable due to Plaintiffs' inequitable conduct." Amended Answer at ¶ 29. Fujitsu asserts that the decision in *Aptix* does not bar its Tenth Affirmative Defense or its Fifth Counterclaim.

The Court concludes that under *Aptix*, Fujitsu's Tenth Affirmative Defense must be stricken. Further, Fujitsu's Fifth Counterclaim must be dismissed to the extent that it seeks a declaration that the '349 and '400 Patents are unenforceable as to entities other than UI, in other actions. On the other hand, to the extent Fujitsu's Fifth Counterclaim seeks to render the '349 and '400 Patents unenforceable as to UI in this action, the counterclaim is not barred under *Aptix* and survives UI's motion to dismiss.

In *Aptix*, a patent infringement action was brought by the owner of the patent, Aptix Corporation, and a licensee, Meta Systems. 269 F.3d at 1372. During discovery, Aptix produced a notebook that the court concluded was fabricated. *Id.* at 1373. As a result, the court declared the patent unenforceable under the doctrine of unclean hands and dismissed the claims of both Aptix and Meta Systems. *Id.* at 1371. On appeal, the Federal Circuit affirmed the dismissal of Aptix on the basis of unclean hands. *Id.* It also affirmed the dismissal of Meta Systems because, as a nonexclusive licensee, Meta Systems did not have standing to prosecute the patent infringement claims on its own. *Id.* However, the Federal Circuit vacated the district court's judgment to the extent that it declared the patent unenforceable. *Id.*

In reaching the conclusion that the patent should not have been declared unenforceable, the Federal Circuit drew a distinction between "inequitable conduct" before the PTO—which taints the property right at issue—and litigation misconduct, which results in "unclean hands." *Id.* at 1375. The court held that in the former situation, a patent could be declared "unenforceable" whereas in the latter situation, courts have only held that the "malfeasant who committed the misconduct" should be denied relief. *Id.* The court stated:

> Thus, the remedies for litigation misconduct differ from the remedies for misconduct in acquisition of a property right. While inequitable conduct before the PTO renders the patent unenforceable by any party, the unclean hands doctrine bars only the offending party.... Moreover, a finding of unclean hands generally does not prejudice the offending party in subsequent cases, but only provides a bar to relief in the case at hand.

*Id.*

In its Tenth Affirmative Defense, Fujitsu has alleged inequitable conduct based the allegations in its counterclaims. However, the allegations in Fujitsu's counterclaims do not include any allegations of misconduct before the PTO. Moreover, at oral argument Fujitsu conceded that at

this stage in the litigation, it cannot, consistent with Fed.R.Civ.P. 11, allege that there has been misconduct before the PTO. Therefore, under *Aptix,* Fujitsu's Tenth Affirmative Defense is legally "insufficient" and should be stricken. *See* Fed.R.Civ.P. 12(f).

In its Fifth Counterclaim, Fujitsu alleges patent misuse and seeks a declaration of unenforceability of the '349 and '400 patents by UI against any party. The Federal Circuit has held that a finding of patent misuse—which is a type of unclean hands—"renders the patent unenforceable until the misuse is purged." *See C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1372 (1998). *Aptix* makes clear, however, that the equitable remedy of unenforceability for unclean hands extends only to the party found to have committed the wrongful acts and to the action in which the unclean hands defense was raised. Thus, to the extent that Fujitsu seeks a broader remedy under its patent misuse counterclaim, that claim must be dismissed. On the other hand, to the extent that Fujitsu seeks a declaration of unenforceability as to UI's claims against Fujitsu in this action based on patent misuse, Fujitsu's Fifth Counterclaim is not barred by *Aptix* and survives UI's motion to dismiss.[24]

## IV. *CONCLUSION*

For the reasons stated above, UI's Motion and Competitive's Motion are GRANTED in Part and DENIED in part. Fujitsu's Conditional Cross–Motion is DENIED as moot.

IT IS SO ORDERED.

---

**24.** The Court declines to address UI's assertion that Fujitsu's factual allegations do not support its counterclaim for patent misuse as this argument was made for the first time in UI's Reply brief.